31 A.3d 529

**John L. BOLAND, et. al.**

v.

**Sean F.X. BOLAND, et al.**

**John L. Boland, et. al.**

v.

**Boland Trane Associates, Inc., et. al.**

Nos. 123, 129, Sept. Term, 2010.

Court of Appeals of Maryland.

Oct. 31, 2011.

Reconsideration Denied Nov. 18, 2011.

298

Joseph P. Suntum (Miller, Miller & Canby, Chtd., Rockville, MD), on brief, for petitioners in No. 123, Sept. Term, 2010.

Michael F. Flynn, Jr. (Erin Schiesel of Gleason, Flynn, Emig & Fogleman, Chtd., Rockville, MD), on brief; John M. Quinn (Michael J. McAuliffe of Ethridge, Quinn, Kemp, McAuliffe, Rowan & Hartinger, Rockville, MD), on brief, for respondents in No. 123, Sept. Term, 2010.

Joseph P. Suntum (Miller, Miller & Canby, Chtd., Rockville, MD), on brief, for appellants in No. 129, Sept. Term, 2010.

Michael F. Flynn, Jr. (Erin Schiesel of Gleason, Flynn, Emig & Fogleman, Chtd., Rockville, MD), on brief; John M. Quinn (Michael J. McAuliffe of Ethridge, Quinn, Kemp, McAuliffe, Rowan & Hartinger, Rockville, MD), on brief, for appellees in No. 129, Sept. Term, 2010.

Argued before BELL, C.J., BATTAGLIA, GREENE, * MURPHY, ADKINS, BARBERA, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

ADKINS, J.

These appeals involve two lawsuits, which include a derivative claim and a direct shareholder action, both arising from a series of stock transactions in a family business owned primarily by eight siblings. Out of those siblings, three brothers served as directors and officers of two family corporations, while the other five siblings were not actively involved in their management. After the death of one of the sisters, the corporations attempted to repurchase her stock pursuant to the terms of a Stock Purchase Agreement. The sister's estate refused on the grounds that the Agreement grossly undervalued the estate's shares. The corporations filed a declaratory judgment action, seeking enforcement of the Stock Purchase Agreement, and named the other, non-director siblings as defendants and interested parties.

Meanwhile, the non-director siblings had learned of an earlier stock transaction in which the three directors had acquired additional corporate stock for themselves. Aggrieved by this transaction, two of the non-director siblings sent a demand for litigation to the corporation, and shortly thereafter filed a derivative action in the Circuit Court for

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Montgomery County, alleging self-dealing and a breach of fiduciary duty.[1] They also filed "direct" claims, as cross-claims in the declaratory judgment action, on related grounds to the derivative action.

In response, the corporations appointed a special litigation committee ("SLC"), consisting of two newly hired "independent directors," to examine the claims. After an extended study, the SLC issued a report concluding that the stock transactions were legitimate and that the Stock Purchase Agreement was enforceable. The Circuit Court, deferring to the judgment of the SLC, granted summary judgment in favor of the corporations on the derivative action. In the declaratory judgment proceeding, the Circuit Court, relying on *res judicata*, dismissed the cross-claims and granted summary judgment to the corporation.

On appeal in the derivative action, the Court of Special Appeals upheld the Circuit Court's grant of summary judgment, agreeing that the SLC's report resolved that matter. The two non-director siblings sought *certiorari* from this Court, which we granted. *See* 417 Md. 500, 10 A.3d 1180 (2010). At the same time, we granted *certiorari* in the declaratory judgment action, which had been pending in the Court of Special Appeals. The questions presented for review in these two cases are as follows, rephrased for brevity and clarity: [2]

---

1. The named defendants in the derivative action, now Respondents, were the two corporations and the four director siblings. We refer to these defendants as "the corporations" or "Respondents," because they act jointly as litigants. In describing facts and legal standards, however, it is sometimes necessary to distinguish between the directors and the corporations. When necessary, we make this distinction. In all actions, the Petitioners are John and Kevin Boland.

2. The original questions in the derivative action were as follows:

 1. Are the circuit courts powerless to consider important issues of public policy, corporate governance, the fiduciary responsibilities of corporate directors, and the rights of minority shareholders, which may be at issue in a derivative action, if a corporate litigation committee determines that continuance of the litigation

**310**

1) In the derivative action, did the Circuit Court apply the correct standard of review when it analyzed the report of the Special Litigation Committee under the Business Judgment Rule and awarded summary judgment in favor of the Respondents, thus rejecting Petitioners' claim?

2) Are the Petitioners' "direct" claims, brought as cross-claims in the declaratory judgment action, precluded by *res judicata* or otherwise resolved by the Special Litigation Committee report?

3) In the declaratory judgment action, did the Circuit Court err in holding that the stock purchase agreements were enforceable and granting summary judgment to Respondents?

---

 and resolution of those issues would not be in the best interest of the corporation as a business entity?

2. Under Maryland law a self-dealing transaction requires close scrutiny of the court under the "entire fairness test." May a circuit court properly find that a litigation committee's review of a self-dealing transaction was reasonable—and dismiss derivative litigation based upon that review—if the committee concededly applied a lessor standard of review to the challenged transaction?

3. Minority shareholders brought individual, statutory claims of oppression against the controlling majority shareholders and board members. The circuit court expressly found that the allegations of the minority shareholders stated a claim for oppression. May the circuit court properly grant summary judgment against the minority shareholders on their oppression claims based upon asserted factual findings of a corporate litigation committee?

In the declaratory judgment action, the Petitioners presented the following questions:

1. A corporation moved a court to dismiss derivative litigation based upon an internal corporate determination that pursuit of the derivative claims would not be in the best interest of the corporation. The court deferred to the corporation's business judgment and granted summary judgment in favor of the corporation, effectively dismissing the derivative claims. Does the summary judgment constitute a judgment on the merits that bars—as res judicata—the assertion of individual, non-derivative claims arising out of the same facts?

2. Did the Circuit Court err in granting summary judgment in favor of the corporations on their complaint for declaratory judgment, where it did so by resolving disputed facts and failing to consider defenses because it found them to be barred as *res judicata?*

In the derivative action (Circuit Court Case # 282138–V, Appellate No. 123), we shall reject the Petitioners' suggestion that Maryland courts should apply their "independent business judgment" and review the SLC's substantive conclusions. Instead, we shall adhere to the business judgment rule as applied in *Auerbach* and limit the judicial investigation of an SLC report to the issues of whether the SLC was independent, acted in good faith based on facts, and followed reasonable procedures. Even under this more limited inquiry, however, we shall reverse the Circuit Court, as the court made an inadequate inquiry into the SLC's independence and the reasonableness of its procedures.

In the declaratory judgment action, (Circuit Court Case # 273284–V; Appellate No. 123) we shall affirm the Circuit Court's grant of summary judgment to the Respondents on the contract issue, because we agree that the Stock Purchase Agreement in this case was supported by adequate consideration and was enforceable. We shall, however, reverse the Circuit Court's grant of summary judgment with regard to Petitioners' cross-claims (the direct action). The court based its summary judgment solely on the grounds that the Petitioner's cross-claims were barred by the doctrine of *res judicata* because of its resolution in the derivative action. As we explain below, the resolution of a derivative claim is not necessarily a factual resolution of the merits of the claim, and the Petitioners stated a separate, individual cause of action regarding allegedly oppressive actions by the majority shareholders.

## FACTS AND LEGAL PROCEEDINGS

### 1. The Boland Family Business

In the early 1960s, Louis Boland Sr., the patriarch of the Boland family, entered into a franchise agreement with the Trane Company to be its exclusive sales agent in the greater Washington, D.C., market. Boland established Boland Trane Associates ("BTA"), to sell and distribute Trane's heating, ventilation, and air conditioning equipment, and Boland Trane

Services, Inc. ("BTS"), to handle services and repairs.[3] Boland served as the chairman of the board and president of both corporations, and along with his wife, Maureen, owned all the stock in the companies.

During the 1960s, Boland[4] gave stock to each of his eight children: Colleen, Louis Jr., Sean, James, John, Kevin, Michael, and Eileen.[5] Later, at Boland's request, each child signed a Stock Purchase Agreement ("SPA"), which restricted their rights regarding the stocks. Specifically, the SPA required the children to offer the stock to the corporations at book value before selling to anyone else, and provided for a corporate repurchase of the stock upon the death of any of the children at book value plus 25 percent. Mr. Boland died on September 7, 2003. Before his death, Boland had set out his desired succession plan in a "Letter of Instruction." Pursuant to the terms of that letter, Sean became chairman of the boards and CEO of BTA and BTS, James became president and chief operating officer, and Louis, Jr. became executive vice president and chief marketing officer. The letter also directed Lawrence Cain to become senior vice president and the chief financial officer. At all times relevant in this case, Sean, James, and Louis Jr. served on the boards of BTA and BTS along with Cain.

Under the new management, BTS and BTA continued to be profitable. In 2004, the corporations issued almost $5 million in dividends to the shareholders, and in 2005, the dividends increased to almost $6 million.

---

**3.** Boland Trane Associates was originally incorporated as "Louis J. Boland, Inc." The company changed its name to Boland Trane Associates, Inc., in 1971. Boland Trane Services was originally incorporated as "Boland Trane Service Agency, Inc.," changing its name to the current form in 1978.

**4.** To avoid confusion, we shall refer to Louis Boland Sr. as "Boland" or "Mr. Boland," his wife as "Mrs. Boland," and the Boland children by their first name.

**5.** Mr. Boland also transferred stock to certain employees of BTS and BTA, including Lawrence Cain, CFO of the corporations

## 2. The Stock Transactions

The dispute centers on a series of stock transactions, the first of which was a corporate repurchase of Mrs. Boland's stock. After Mr. Boland's death, Mrs. Boland owned a 20 percent share in BTS. Seeking to reduce her eventual estate for tax purposes, and to secure a more stable source of income, Mrs. Boland negotiated with BTS to exchange her stock in return for the purchase of an annuity. On June 25, 2004, she sold her holdings in BTS back to the corporation, and the corporation purchased her an annuity which provided a monthly payment of $28,544.70 for life.

After the repurchase of Mrs. Boland's stock, the director siblings designed a series of stock purchases that would give them an increased share in BTA and BTS. First, in January 2005, BTS approved a sale of 75,075 shares to Sean's son, Sean Jr., and 151,150 shares to James, all at the price of $2.16 per share.[6] Then, in April 2005, BTA approved a sale of 282 shares of BTA to Lawrence Cain, 70 shares to Sean Jr., 566 shares to James, and 282 shares to Louis Jr., all at a price of $508 per share.[7]

After these transactions, the Directors and Sean Jr. all had an increased ownership in the corporations. Sean Jr., who previously owned no stock in either corporation, now held just under 2 percent in each company. James increased his share of BTS by approximately 3 percent, and his share in BTA by 14 percent. Louis Jr. and Lawrence Cain each increased their share in BTA by approximately 7 percent. The boards approved the stock sales, retroactively, on April 4, 2005, at a meeting attended by Sean, James, Louis Jr., and Cain.[8]

---

6. The stock was priced pursuant to a private appraisal, dated October 11, 2004.

7. The valuation at $508/share was the book value as of December 31, 2004.

8. Each director abstained on the vote to approve their purchase, and Sean abstained on the stock sale to his son.

The Board's stated purpose in approving these transactions was to compensate the corporations' directors and to increase their management share to a level comparable to similar corporations. The Board recognized a "need for management incentives for both short-term financial results as well as long-term growth of shareholder value[,]" and "acknowledged [that] it was most desirable to continue the employment of the [Directors] and adequately compensate them for their efforts and reward them for their accomplishments." In order to accomplish these goals, "the Board agreed it was critical that the compensation plan include an appropriate ownership interest in the Corporation's stock."

The Boards structured the payments for these stocks in a way that required no money up front. Instead, in exchange for the stocks, the recipients gave promissory notes with nine-year terms and a set interest rate. At the rate the corporations were issuing dividends, these newly issued stocks would eventually pay for themselves.[9]

### 3. Dispute over the Transactions

The directors' stock purchases came to the attention of the non-director siblings, specifically John and Kevin, in June 2005.[10] From that point, relations between the two factions of siblings quickly deteriorated.[11] The straw that broke the

---

**9.** For example, in exchange for the stocks, Sean Jr. promised to pay $162,162, plus interest, to BTS and $35,560, plus interest, to BTA. Yet, in 2005 alone, the year following Sean Jr.'s stock purchases in which the corporations paid out nearly $6 million in total dividends, his nearly 2 percent share in BTS and BTA would have resulted in almost $120,000 of dividend payments, significantly more than half of the total he would have owed under the promissory notes.

**10.** Apparently, Louis complained to his brother Michael that Sean Jr. was receiving stock through the transactions, a result not otherwise permitted by the Stock Purchase Agreements.

**11.** John and Kevin alleged, in their derivative complaint and cross-complaint, a series of increasingly heated personal confrontations between the director siblings and the non-director siblings. Moreover, the non-director siblings exacted temporary revenge, in July 2005, by taking over a related family business. The non-director siblings took

camel's back, and brought the whole family into court, was the corporations' attempt to exercise their rights under the SPA, after the death of Colleen.

Colleen died on June 7, 2006, and the corporations sent notice of their intention to repurchase the stocks on June 16, 2006. The valuation of her stock, pursuant to the stock purchase agreement, was significantly lower than some estimations of its market value. Upset at the low valuation of the stock, Colleen's personal representative resisted the corporations' attempts.

On July 19, 2006, the Respondents filed a complaint for declaratory judgment, seeking to enforce the repurchase provisions in Colleen's SPA, naming all the Boland siblings as defendants/interested parties.

Ten months later, on May 1, 2007, John and Kevin responded on two fronts. First, they filed a cross-claim in the corporation's declaratory judgment action, alleging breach of fiduciary duty, self-dealing, and oppression from threats to enforce buy-back provisions in the SPAs. This was a "direct" action. Second, after sending the requisite demand for litigation to the corporations, John and Kevin filed a derivative complaint, on behalf of both BTS and BTA, naming Sean, James, Louis, and Lawrence Cain as the defendants.[12] Their

---

control of Boland Properties II, LLC, a real property company, which was owned by the siblings and controlled by majority, by voting to remove James as a managing Member of the LLC and to replace him with two of their own, Michael and John. Four of the five non-director siblings voted to reinstate James in September 2005.

12. In the initial "demand" filed, Kevin and John hedged as to whether such demand was required, stating that any requirement for demand was "arguable" in this case. Similarly, in their complaint, Kevin and John fashioned the derivative suit as a "demand refused" action, but hedged on whether demand could have been excused. They stated in the complaint that "the defendants demanded in early March 2007 that the Board of Directors of BTS take action to remedy the wrongs committed by the defendants[,]" and that "[t]he Board has refused to act as demanded." They also stated, however, that "[i]t would be futile to make further demand upon the defendants and it is not reasonable to expect the defendants to direct BTS to sue them for their misconduct."

**316**

allegations included fraudulent conduct, oppression of minority shareholders, and breaches of the duties of good faith and loyalty, and they requested, inter alia, rescission of the stock transactions, compensatory damages, attorney's fees, and dissolution of the corporations.

■ Maryland courts have distinguished between direct and derivative claims by looking at the nature of the right claimed to be violated, and the remedy sought. In *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 983 A.2d 408 (2009), for example, the shareholders brought claims after the corporation approved a cash-out merger, alleging that the directors "violated the fiduciary duties of candor and maximization of value" resulting in "a lesser value that shareholders received for their shares in the cash-out merger[.]" *Id.* at 346, 983 A.2d at 425. We held that claim to be direct, as the fiduciary claims were "based on a breach owed directly to the shareholder[,]" and the injury was "suffered solely by the shareholders and not by [the] corporate entity. . . . A higher or lower price received by shareholders for their shares in the cash-out merger in no way implicated [the corporation's] interests and causes no harm to the corporation." *Id.*, 411 Md. at 346–47, 983 A.2d at 425.

■ More generally, we have recognized the fundamental differences between a direct claim and a derivative claim. The derivative suit involves a *corporate right,* a distinction underlying many of the derivative action's peculiar procedures and standards of review. *See, e.g., Werbowsky v. Collomb,* 362 Md. 581, 600, 766 A.2d 123, 133 (2001) ("The fact that the action is on behalf of the corporation, rather than the shareholder, has significant implications, not the least of which is the extent to which the corporation can control the litigation after it is filed."); *see also Shenker,* 411 Md. at 344, 983 A.2d

---

As the Court of Special Appeals concluded, however, this lawsuit is properly labeled a "demand refused" lawsuit. *See Boland v. Boland,* 194 Md.App. 477, 496, 5 A.3d 106, 117 (2010) (The "case at bar" is a "demand refused case."). Petitioners do not contest such a label. Moreover, as we will discuss further, *see infra,* the distinction between a "demand refused" and "demand excused" case is not dispositive here.

at 424 ("In a derivative action, any recovery belongs to the corporation, not the plaintiff shareholder."); 12B William Meade Fletcher, et al, *Cyclopedia of the Law of Private Corporations* § 5921 (2009 Rev. Vol.) ("A shareholder may sue as an individual where the act complained of creates not only a cause of action in favor of a corporation but also creates a cause of action in favor of the shareholder as an individual ... and under certain circumstances, *even if the shareholders are unable to get relief on behalf of the corporation, their individual wrongs are not without remedy.*") (emphasis added).

One advantage a derivative action has for the shareholder is that the expenses of the litigation, if successful, may be borne by the corporation, not the shareholder: "In direct, as opposed to derivative actions, each side will normally be responsible for its own legal expenses. Costs and expenses of bringing a successful derivative action are usually available for the plaintiff-shareholder, and some jurisdictions may provide by statute for the recovery of attorney's fees in derivative actions." Fletcher, *supra*, at § 5938. In Maryland, recovery of attorney's fees is permitted under the "common fund" doctrine. *See, e.g., Hess Constr. Co. v. Board of Educ.*, 341 Md. 155, 168, 669 A.2d 1352, 1358 (1996) (observing that the common fund theory, allowing reasonable recovery of fees for a successful plaintiff, is allowed "where a stockholder's derivative action benefitted all of the shareholders") (citing *Davis v. Gemmell*, 73 Md. 530, 21 A. 712 (1891)).[13]

The "direct" claim alleged by John and Kevin is that the majority shareholders oppressed them and threatened to squeeze them out of the company. In *Edenbaum v.*

---

**13.** In addition, Maryland has adopted statutory cost-shifting provisions for limited partnerships and limited liability corporations. *See* Md. Code (1975, 2007 Repl.Vol.), § 10–1004 of the Corporations and Associations Article ("CA") (In an action brought by partners in a limited partnership, "[i]f a derivative action is successful, in whole or in part ... the court may award the plaintiff reasonable expenses, including reasonable attorney's fees[.]"); CA § 4A–804 (In a successful derivative action involving a limited liability corporation, the court "[m]ay award the plaintiff reasonable expenses, including reasonable attorney's fees[.]").

*Schwarcz–Osztreicherne,* 165 Md.App. 233, 885 A.2d 365 (2005), Judge Krauser described a similar claim of oppression:

"Oppressive" conduct is not defined by the statute. But, as it is singled out as a separate category of conduct justifying corporate dissolution by Corps. & Ass'ns § 3–413(b)(2), we surmise that it does not necessarily involve "fraudulent" or "illegal" conduct. "Oppressive" conduct has been described by other jurisdictions as:

> burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

\* \* \*

"Oppression," however, has also been defined by one Maryland commentator as "conduct that substantially defeats the reasonable expectations of a stockholder." James J. Hanks, Jr. Maryland Corporation Law § 11.7(b) (1990, 2004 Supp.). Or, in the more precise terminology of one of our sister states, "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." (Citations omitted.)

*Id.* at 255–56, 885 A.2d at 377–78. The "direct" suit, alleging oppression, requested dissolution of the corporations, and any recovery would have run directly to John and Kevin.

The derivative suit, on the other hand, alleged injury to the corporation. At oral argument, the Petitioners asserted that, because of the stock purchases by the directors, the corporation was deprived of assets, that is, corporate treasury stock that it could have sold to third-parties for fair market value, an amount the Petitioners allege was much greater than the price paid by the director siblings.[14]

---

**14.** We are not asked to decide, in this appeal, whether a devaluation of treasury stock caused by the allegedly improper stock transaction constitutes a corporate injury.

The two cases were consolidated by the Circuit Court on June 6, 2007.

### 4. The Special Litigation Committee

The corporations appointed two outside, independent directors to the Special Litigation Committee, at a May 2007 meeting of the Boards of Directors. These new directors had no business relationship with the corporations. Each had significant experience in corporate matters.[15] The new directors hired another attorney to serve as the SLC's independent counsel.[16] On October 3, 2007, by motion of the corporation, the Circuit Court stayed the consolidated action to allow the SLC an opportunity to investigate the derivative claim.

The SLC investigated the issues presented in the derivative complaint, as well as an issue it apparently raised on its own: whether John and Kevin were "adequate shareholder representatives." The Court of Special Appeals summarized the SLC's investigation as follows:

> [T]he SLC's investigation took five months. . . . The SLC met with Michael, Eileen, John, Kevin, Cain, Louis, Jr., James, Heise, Sean, Jr., Sean, and counsel for Maureen. The interviews were at least 45 minutes and lasted up to 5 hours, with the longest interviews being with [John and Kevin]. The interviews were conducted separately and with the interviewees signing confidentiality agreements, to promote frankness. The SLC also gave counsel for the appellants and for the corporations the opportunity to submit memoranda stating their differing positions. Counsel for the corporations submitted such a memorandum, while counsel for [John and Kevin] submitted the complaint in the

---

**15.** One SLC director had been a director of two banks and a chairman of the board at another. He had previously served as a court appointed special investigator on arbitration and mediation issues.

 The other was a CPA who founded a data processing service company and a payroll services company. He was a member of many accounting and business professional associations, and sat on the boards of many community organizations.

**16.** This attorney had no business relationship with BTA and BTS.

derivative action. Pursuant to a request by [an SLC director, John and Kevin's] attorney met with the SLC to discuss the allegations in the derivative suit. The SLC reviewed and summarized a total of 131 documents in the course of its investigation.

*Boland v. Boland,* 194 Md.App. 477, 512–13, 5 A.3d 106, 127 (2010).

After this investigation, the SLC concluded that "none of the derivative claims have merit and the actions on behalf of the corporations should be terminated." The SLC first found that "each individual's salary is commensurate with his education, experience, position, and tenure with the company." The SLC also approved of the stock sales to the directors, stating as follows:

The enhancement of control is a positive benefit for the corporations. The SLC finds those transactions to be well within the business judgment rule and done in good faith for the benefit of the corporation. *See Cummings v. United Artists Theater [Theatre ] Circuit, Inc.,* 237 Md. 1, 22, 204 A.2d 795 (1964); *Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App. 185, 198, 461 A.2d 45, 53 (1983).

But an issue of the stock that has the collateral effect of enhancing the power of incumbent management is not invalid if the transaction has its principal purpose some proper corporate goal.

*[Id.* at 197,] 461 A.2d at 52 (quoting *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir.1977)).

Further, the price received for those shares is more than in dollars. It rewards and expects services to be performed for the corporation. The law is well settled that a corporation may receive payment in any form that it may lawfully purchase property. To give stock in whole or in part for return for services is certainly well accepted and within the business judgment rule.

\* \* \*

The SLC finds that the price paid for the stock was appropriate.

Then the SLC moved on to the issue of "adequate representation." The SLC concluded that John and Kevin were not adequate representatives of the shareholders:

> [T]he majority shareholders disagree with [John and Kevin] and it is therefore obvious that they do not adequately represent all of the shareholders. In addition, it is clear that the derivative claims appear to be pursued for reasons other than their merit. [John and Kevin's] purpose seems to be to gain leverage in their personal efforts to change the provisions of the SPAs or obtain new agreements with terms they desire to further their perception of personal and family purposes in the future ownership and management of the corporations. [For example, Kevin Boland] describ[ed] his views and purportedly those of [John] as well that:
>
>> There is real resentment that Jimmy has so much power on whether the company ever gets sold. Jimmy has told some of us that it is his dream to someday run the family business. For the younger half of the family, his dream is our nightmare.
>
> These views are directly opposite those of Louis Boland, Sr.[.]

The SLC concluded as follows:

> The duty that is owed by the Director defendants is defined in Md.Code Ann., Corps. & Ass'ns, § 2-405.1 to act in: (1) good faith (2) in the best interests of the corporation (3) in a manner that an ordinarily prudent person in like or similar circumstances would exercise. The SLC finds the conduct of the Defendants to have met this standard.

The SLC submitted this report to the Circuit Court on February 1, 2008.

### 5. The Derivative Case

After the submission for the SLC's report, the Circuit Court severed the derivative action from the declaratory judgment

action. In the severed derivative action,[17] the corporations moved to dismiss, based on the SLC report, on February 11, 2008. John and Kevin requested the court to review the SLC report under an "entire fairness" standard, while the corporations argued that the business judgment rule should apply.

On September 5, 2008, the Circuit Court denied the motion to dismiss.[18] The Circuit Court first stated its standard of review: [19]

> In reviewing the findings and conclusion of the [SLC], the [SLC] is entitled to the benefit of the Business Judgment Rule. If, however, the transaction being evaluated by the Committee is one in which directors are 'on both sides of the transaction,' then the Court must apply the "entire fairness standard."

\* \* \*

> [T]he factual determinations to be made by the court are (1) were the [SLC] members independent and did they perform their duties in good faith?; (2) did the [SLC] undertake a reasonable investigation of plaintiff's derivative claims?; and (3) are the findings and conclusion of the [SLC] reasonable? (Citations omitted.)

Reviewing the SLC's procedure under this standard, the Circuit Court concluded that the SLC was independent, performed its duties in good faith, and made a reasonable investigation. Turning to the third step, the court analyzed whether

---

**17.** Circuit Court Case # 282138–V, Appellate No. 123.

**18.** There is some conflict on the dates of motions in orders in the Circuit Court proceeding. The September 5, 2008 memorandum order by the court, for example, was issued with a date of August 4, 2008, and later referred to by the court as an August 15, 2008 order. To avoid confusion, we will consistently refer to the date referenced on the official docket entries.

**19.** As support for this three-step inquiry, the court cited the April 16, 2008 memorandum opinion of Judge Matricciani, then sitting as a Circuit Court Judge in Baltimore City, in *Costa Brava Partnership III v. Telos Corp.*, Baltimore City Civil Action No. 24–C06–009296, 2008 WL 2400865.

the SLC made reasonable findings and conclusions on each individual count. The Circuit Court determined that the SLC's conclusion on the executive compensation was reasonable.[20] Then, however, the court denied the corporations' motion to dismiss so far as it pertained to the purchase by the corporations of Maureen Boland's stock, concluding that the SLC did not undertake a reasonable investigation with respect those allegations. The Circuit Court thus granted the corporations' motion to dismiss "with the exception of the claim against Defendant Cain and the purchase by the corporations of the shares of Maureen Boland stock from her estate."

The corporations filed a motion for reconsideration, arguing that the Circuit Court erred in applying an "entire fairness" test, and that the court should instead adhere to the business judgment rule. Without a hearing, the Circuit Court issued (1) an order granting the motion for reconsideration, and (2) a memorandum opinion granting summary judgment.[21] The court applied the business judgment rule, as opposed to an entire fairness test, to the counts which survived the September 5, 2008, order. The court's analysis, under the business judgment rule, of the subject corporate actions is, in its entirety, as follows:

### Compensation of Lawrence J. Cain, Jr.

The finding by this Court that the compensation of Director Cain was not addressed by the SLC is also in error.

---

**20.** The Circuit Court excepted from this ruling the issue regarding the compensation of Lawrence Cain Jr., observing that the SLC report did not "mention ... how [Cain's] compensation was determined."

**21.** Although the corporations and directors initially moved to dismiss, the court granted summary judgment because, after the motion for reconsideration, the corporations and directors filed a "Motion to Dismiss or in the Alternative, for Summary Judgment, and ... the consideration of the Motion extended to documents outside the four corners of the Cross–Complaint[.]" *See* Maryland Rule 2–322(c) ("If, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment[.]").

The compensation of Cain and the other Directors was addressed by the SLC, whose decision must be reviewed under the business judgment standard. The application of the standard is clearly bolstered by the report of the SLC and the compensation of Director Cain is found by this Court to come within the standard. The Motion to Dismiss shall be granted in favor of Cain.

### The Propriety of the Stock Purchase and Sale to Interested Directors

There are two stock transactions at the center of the claim contained in the Counter–Claim. In January, 2005 BTS sold James and Sean Jr. authorized but not issued stock. Then in April, 2005, a sale of BTA stock to Cain was authorized. The defendants, John and Kevin, seek a rescission of the stock sale.

The sale of the stock was a part of an overall executive compensation plan. *Bender, supra,* is cited in support of the exercise of deference to the board's decisions as to the levels of compensation under the business judgment rule. The sale and grant of stock meets this test. John and Kevin have not alleged fraud or deceit in the Counter–Complaint which requires the examination by the Court of the process, scope, and thoroughness of work performed by the SLC. This aspect was fully discussed in the original Memorandum Opinion. Given the standard of review, this Court concludes that the transactions fall within the Business Judgment Standard and will not be set aside.

(Footnote omitted.)

The Circuit Court thus granted summary judgment on all counts.[22]

---

22. The Circuit Court mistakenly issued its grant of summary judgment in the derivative action under the case number for the declaratory judgment action. After the parties moved for clarification, the Circuit Court entered a new order granting the motion for reconsideration and granting summary judgment for the corporations, under the case number of the derivative action, on February 5, 2009.

### 6. The Declaratory Judgment Action

After judgments against the plaintiffs in the derivative action, all that remained in the Circuit Court was the corporations' action for declaratory judgment, and John and Kevin's cross-claims and counterclaims, in Case # 273284–V.[23] In particular, the Circuit Court asked the parties to brief whether resolution of the derivative claim also ended the "direct" dispute:

> And what will be interesting to me is the right of individuals to bring an oppression claim when a derivative action is already decided in a case. . . . So it's a very intense examination of the pleading and the decisions made thus far . . . ? Is it a separate claim or different claim from the derivative claim?

At a hearing on April 16, 2009, the two parties disputed whether the derivative claim could preclude direct claims based on similar factual events and allegations. The corporations argued that John and Kevin's claims were precluded by *res judicata*, because of the court's resolution of similar factual allegations in the derivative matter, stating at a hearing:

> [There are] no new allegations at all being raised in the amended counter-claim or in the cross-claim concerning oppression that weren't already raised. The conduct, the bad conduct on the part of the defendants was examined, it was alleged, it was litigated, it was examined by the [SLC,]

---

**23.** Earlier, in the September 5, 2008 memorandum opinion, which addressed certain aspects of the derivative action, the Court also addressed whether John and Kevin's "direct claims" were properly included in the declaratory judgment action as cross-claims under Maryland Rule 2–331(b), concluding that those "[t]he allegations in the Cross-Claim do not arise out of the SPAs, therefore, the Cross–Claim must be struck." John and Kevin then moved the Court to reconsider striking their Cross–Claim, instead asking them to "sever" their individual claims of oppression.

The Circuit Court held a hearing on January 16, 2009 to clarify the procedural posture of the two cases. At that hearing, counsel for John and Kevin asked the court, among other things, to clarify its earlier rulings so that their cross-claims of oppression, and various counterclaims were still viable.

and the [SLC] came up with some findings and found that there was no merit.

The Court later agreed:

> But the point I'm making is that if the [SLC], within the proper context of the operation of [an SLC], did make judgments about whether the board had acted improperly and had oppressed all stockholders, [then] why isn't that ultimately a *res judicata* binding decision that I have made by endorsing the SLC?
>
> \* \* \*
>
> The Court's persuaded that the derivative claims have been fairly decided and that opinion speaks for itself and that's on appeal and I do not intend, as part of this action, to permit any revisiting of those issues.
>
> To that end, the Court ... grant[s] the [Respondents'] motion to dismiss ... the cross-claim with leave to amend.... [John and Kevin] will be permitted to re-file ... [but you] must identify specific oppression of Kevin and John.
>
> \* \* \*
>
> ... I intend to scrutinize any [additional claims] by John and Kevin, and if I determine that it is in essence a restatement of the derivative claims, it's going to go out.

The Court concluded at the hearing that *res judicata* could apply and dismissed all of John and Kevin's "direct" claims, but it granted them leave to amend their complaints one final time to demonstrate an individual cause of action separate from the derivative claims.

After John and Kevin filed an amended Counter–Claim on May 12, 2009, the court held a hearing on July 30, 2009, to consider whether any could survive *res judicata.* The court again concluded that John and Kevin had failed to present distinct claims from the derivative action:

> I find that there was a final judgment, the claims are virtually identical, the parties are the same ... and there is adequate relief under the declaratory judgment action so

that it's not, dismissal does not then become prejudicial to [John and Kevin]. And accordingly the court determines then that the second amended counterclaim and amended cross-claim should be dismissed.

Having dismissed the direct claims of John and Kevin, the court finally turned to the dispute over the enforceability of the Stock Purchase Agreements. After a hearing, the court granted the Respondents' motion for summary judgment. Finding the SPAs to be "plain and unambiguous[,]" supported by consideration, and still valid despite Louis Sr.'s death, the court ordered Colleen's estate to abide by the redemption clause.

John and Kevin filed an appeal to the Court of Special Appeals, and while that action was pending we granted a writ of certiorari.

## DISCUSSION

### I.

The first issue before the Court is the Circuit Court's grant of summary judgment to the defendants in the derivative action. We begin with a brief discussion of judicial review of derivative actions.

The common law tailored the derivative action to be a "justifiable, but limited, intrusion upon the general authority of the directors to manage the business affairs of the corporation." *Werbowsky*, 362 Md. at 602, 766 A.2d at 135. As an exception to the general rule that "the business and affairs of a corporation are managed under the direction of its board of directors[,]" the derivative action is an "extraordinary equitable device to enable shareholders to enforce a corporate right" in certain circumstances. *Id.* at 598–99, 766 A.2d at 133. "The purpose of the derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Shenker*, 411 Md. at 342, 983 A.2d at 423 (quotation marks and citations omitted). Despite the

role given the shareholder, the "corporation is the real party in interest and ... [t]he substantive claim belongs to the corporation[.]" *Werbowsky*, 362 Md. at 599–600, 766 A.2d at 133 (quoting 13 William Meade Fletcher, et al, *Cyclopedia of the Law of Private Corporations*, § 5941.10 (1995 Rev. Vol.)). The derivative suit thus balances the interests of the shareholders with those of the corporation and its directors.

 The main levers with which the courts maintain this balance are varying levels of judicial scrutiny of corporate decisions. The default standard is the deferential business judgment rule, which insulates "the business decisions made by the director from judicial review[.]" *Shenker*, 411 Md. at 344, 983 A.2d at 424. The Delaware Supreme Court, in a popular formulation of the rule, described it as follows:

> It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) (citations omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000); *see also Della Ratta v. Larkin*, 382 Md. 553, 579, 856 A.2d 643, 659 (2004) ("[T]he business judgment rule requires that the decision maker act in good faith and on an informed basis."). This standard recognizes that the "conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable." *Devereux v. Berger*, 264 Md. 20, 31–32, 284 A.2d 605, 612 (1971) (quoting *Parish v. Md. & Va. Milk Producers Ass'n*, 250 Md. 24, 74, 242 A.2d 512, 540 (1968)).[24]

---

**24.** In Maryland, the business judgment rule is codified in Maryland Code (1975, 2007 Repl.Vol.), Section 2–405.1 of the Corporations and Associations Article ("CA"). That section assigns the following duties to directors of a corporation:

In certain circumstances, courts decline to employ this deferential standard, thus ensuring that stockholders are protected from more egregious corporate actions. The protection of the business judgment rule "can be claimed only by 'disinterested directors whose conduct otherwise meets the tests of business judgment.' " *Werbowsky*, 362 Md. at 609, 766 A.2d at 138 (quoting *Aronson*, 473 A.2d at 812). "[T]his means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* A shareholder may "show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." *Bender v. Schwartz*, 172 Md.App. 648, 666, 917 A.2d 142, 152 (2007). If the shareholder makes this showing, she may avoid the dangerous terrain of the business judgment rule.

This approach, where courts defer to corporate decisions generally, but inquire into the method, process, and self-interest of the decision makers, applies "to all decisions regarding the corporation's management." *Shenker*, 411 Md. at 344, 983 A.2d at 424 (citing *NAACP v. Golding*, 342 Md. 663, 673, 679 A.2d 554, 559 (1996)). In a derivative lawsuit, this includes a corporate decision on whether the case should proceed, as "any exercise of the corporate power to institute litigation and the control of any litigation to which the corpo-

---

(a) *In general.*—A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

That section further provides that "[a] person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability [arising from performance of those duties]" and that "[a]n act of a director of a corporation is presumed to satisfy the standards of . . . this section." CA § 2–405.1(c), (c).

ration becomes a party rests with the directors[.]" *Werbow-sky*, 362 Md. at 599, 766 A.2d at 133. Thus, the common law developed a requirement that the derivative plaintiff, at the outset, seek a corporate decision on whether to maintain a lawsuit, a prerequisite known as the "demand requirement." *See Waller v. Waller*, 187 Md. 185, 192, 49 A.2d 449, 453 (1946) (observing that a stockholder must "allege and prove he requested the directors to institute suit in the name of the corporation, and they refused"); *Shenker*, 411 Md. at 343–44, 983 A.2d at 423 (describing demand requirement as one of "a number of procedural hurdles [the derivative plaintiff must overcome to] demonstrate that he or she, rather than the corporation itself, should control the litigation"). *See generally Werbowsky*, 362 Md. 581, 766 A.2d 123 (discussing changes in the demand requirement and the futility exception).

> Once demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation. If the corporation, after investigation, fails to take the action requested by the shareholder, the shareholder may bring a 'demand refused' action.
>
> (Citations omitted.)

*Shenker*, 411 Md. at 344, 983 A.2d at 423–24.

Judicial review of a demand refusal is subject to the business judgment rule, and the court considering a demand refused action limits its review to whether the board acted independently, in good faith, and within "the realm of sound business judgment." *See George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md.App. 586, 611, 14 A.3d 1193, 1208 (2011) (citing *Bender*, 172 Md.App. at 666, 917 A.2d at 152) ("To determine whether the board wrongly refused to bring suit, courts review the board's investigation under the strict business judgment rule. Under that rule, courts [generally] defer to the board or committee's decision not to bring suit[.]"). "The plaintiff can still allege that the board, in fact, did not act independently, or that the

board's refusal to bring suit was wrong." *Id.* If the plaintiff can successfully show that the subject decision was not the product of sound business judgment, the reviewing court may allow the derivative suit to proceed.[25]

---

**25.** Traditionally, another way for the derivative plaintiff to avoid dismissal by the board was to bring a "demand excused" action. In early cases, this Court recognized that a plaintiff may be excused, in certain circumstances, from the demand requirement. *See Booth v. Robinson,* 55 Md. 419 (1881) (holding demand excused when "a majority of the directors are adverse to the interest of the plaintiffs, and are combined against them, and would, by means of the control that they exercise, frustrate and defeat any attempt to induce the corporation to take action for the redress of the wrongs alleged"); *Davis v. Gemmell,* 70 Md. 356, 376, 17 A. 259, 265 (1889) (holding demand excused if the directors or officers "are themselves guilty of the wrong complained of"). In such a lawsuit, the derivative plaintiff, upon a showing that demand was futile, was granted direct access to the courts.

Over time, courts and legislatures have moved towards a "universal demand" requirement. *See generally Werbowsky v. Collomb,* 362 Md. 581, 602, 766 A.2d 123, 135 (2001). This Court has yet to close the door on the "futility" exception to demand requirement, although we have recognized that it is applicable in narrow circumstances:

We adhere, for the time being, to the futility exception, but, consistent with what appears to be the prevailing philosophy throughout the country, regard it as a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

*Id.* at 620, 766 A.2d at 144.

Under *Werbowsky,* a demand on the board may be required, or at least advisable, even though the board itself may not be in a position to render the decision itself, due to the nature of the allegations or the existence of adverse interests. Indeed, one justification for the expanded demand requirement is to give the corporation an opportunity to engage an SLC. *See Werbowsky,* 362 Md. at 619, 766 A.2d at 144 (observing that a demand sent to the board members "may be their first knowledge that a decision or transaction they made or approved is being questioned, and they may choose to seek the advice of [an SLC] of independent directors, which has become a common practice"). Thus, the line between a special litigation committee and a distinct "demand committee" has blurred.

One byproduct of the narrowing "futility" exception is that the procedural distinctions between a "demand excused" and "demand refused" action may no longer be viable. Courts and commentators

Of course, the reality is that many business dealings are approved by directors who are not entirely disinterested; those dealings thus may not be entitled to deference on their decisions regarding a derivative lawsuit. Rather than stripping such transactions of the business judgment rule's protection, courts have recognized a vehicle, usually known as a special litigation committee ("SLC"), through which corporations can retain a voice in the derivative lawsuit despite the adverse interests of board members. *See generally Gall v. Exxon Corp.,* 418 F.Supp. 508 (S.D.N.Y.1976) (recognizing that a committee of disinterested directors, to whom the corporation delegates decision-making ability, may make a decision to dismiss derivative litigation). An SLC, composed of independent, disinterested directors, either inside the corporation or specially appointed from outside the corporation, is vested with the authority to render a corporate decision. By isolating the tainted directors and delegating the corporation's decision-making ability to an independent committee, the directors may be able to insulate themselves from a derivative lawsuit. In general, the use of SLCs has spread and is now widely recognized, and it is not disputed that an SLC may recommend termination of a derivative lawsuit. *See, e.g., Werbowsky,* 362 Md. at 619, 766 A.2d at 144 (observing that the use of special litigation committees has become a "common practice") (citing, *inter alia, Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)).

---

have often drawn strict distinctions between the two actions. *See, e.g.,* Dennis J. Block, Nancy E. Barton, & Stephen A. Radin, 2 *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 1689–90 (5th ed. 1998) ("[The] special litigation committee termination procedure need not be utilized when demand is required because if demand is required the board as a whole may act in a manner that will be judged pursuant to the business judgment rule."); *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.1981) (limiting its additional "independent business judgment" review to demand excused cases).

Because courts have encouraged derivative plaintiffs to file such a demand, including in cases where the Board may find it advisable to appoint an SLC, *see Werbowsky,* 362 Md. at 619, 766 A.2d at 144, it is clear that the derivative plaintiff may continue to contest the independence of the board members after filing such a demand, and should not be prejudiced by that choice.

## II.

A more disputed question is how rigorously a court should review that recommendation. One approach, commonly referred to as the *Auerbach* approach, after the case *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), treats the SLC's decision like other corporate decisions, and engages in limited review under the business judgment rule. Another approach, known as the *Zapata* approach, after the Delaware case *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.Supr.1980), provides an additional layer of scrutiny. In this appeal, Petitioners have criticized the *Auerbach* approach and requested this Court to adopt the *Zapata* approach instead. We discuss these two divergent approaches before considering the Petitioners' specific claims.

In *Auerbach*, shareholders of a corporation brought a derivative action regarding certain illegal foreign payments made by the corporation. *See Auerbach*, 419 N.Y.S.2d 920, 393 N.E.2d at 997. In response, the corporation appointed an SLC to consider the claims.[26] After the SLC concluded, in a report to the trial court, that it was not in the corporations' best interest to pursue the lawsuit, the court granted summary judgment on the derivative complaint. *Id.*, 419 N.Y.S.2d 920, 393 N.E.2d at 1000.

On appeal, the appellate court concluded that the SLC's decision fell under the business judgment rule, explaining that the "ultimate substantive decision . . . not to pursue the claims advanced in the shareholders' derivative actions . . . falls squarely within the embrace of the business judgment doctrine . . . [and] is outside the scope of our review." *Id.*, 419

---

**26.** The *Auerbach* court, providing further detail, stated that the SLC was composed of "three disinterested directors who had joined the board after the challenged transactions had occurred" and was vested with "all of the authority of the Board of Directors to determine, on behalf of the Board, the position that the Corporation shall take with respect to the derivative claims alleged on its behalf in the present and similar shareholder derivative actions." *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 997 (1979) (quotation marks omitted).

N.Y.S.2d 920, 393 N.E.2d at 1002. In support of this conclusion, the *Auerbach* court recognized that the decision to pursue a derivative action involves "the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems." *Id.* The court further recognized that

> [C]ourts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments. The authority and responsibilities vested in corporate directors both by statute and decisional law proceed on the assumption that inescapably there can be no available objective standard by which the correctness of every corporate decision may be measured, by the courts or otherwise. Even if that were not the case, by definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility.

*Id.,* 419 N.Y.S.2d 920, 393 N.E.2d 994 at 1000. A more limited inquiry into methodologies and procedures, the court observed, was well within the domain of the judicial system:

> As to the methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability, the courts are well equipped by long and continuing experience and practice to make determinations. In fact they are better qualified in this regard than are corporate directors in general. Nor do the determinations to be made in the adoption of procedures partake of the nuances or special perceptions or comprehensions of business judgment or corporate activities or interests. The question is solely how appropriately to set about to gather the pertinent data.

*Id.,* 419 N.Y.S.2d 920, 393 N.E.2d 994 at 1002. The *Auerbach* rule, like the business judgment rule generally, carves out a limited role of judicial review, and allows a "tainted" board of directors to reclaim the protection of the business judgment rule through the appointment of an SLC.

One year later, Delaware emerged with an alternative standard in the landmark *Zapata* case. As in *Auerbach,* the *Zapata* court considered the appropriate standard of review of an SLC's conclusion that a derivative lawsuit should be dismissed.[27] The *Zapata* court perceived a shortcoming in allowing the corporation to completely regain the business judgment rule through a special litigation committee in such an action. Specifically, the court thought the *Auerbach* approach, in a demand refused action, failed to adequately protect shareholders, and that the SLC's decision needed "fresh view of a judicial outsider[.]"[28] *Zapata,* 430 A.2d at 788. The *Zapata* court summarized this new standard, which it termed its "independent business judgment," as follows:

> Whether the Court of Chancery will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal of a derivative action, where a demand has not been initially made, should rest, in our judgment, in the independent discretion of the Court of Chancery. We thus steer a middle course between those cases which yield to the independent business judgment of a board committee and this case as determined below which would yield to unbridled plaintiff stockholder control. In pursuit of the course, we recognize that the final substantive judgment whether a particular lawsuit should be maintained requires **a balance of many factors—ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal.**
>
> \* \* \*
>
> [When presented with a motion to dismiss or for summary judgment based on an SLC's conclusion] [t]he Court should

---

27. *Zapata* involved a "demand excused" action, a distinction the *Zapata* court relied on to carve out its enhanced role. *Zapata,* 430 A.2d at 787.

28. In crafting the "independent" review, the *Zapata* court relied on analogy to two other areas of the law: judicial approval of settlements and a plaintiff's request to dismiss the case after an answer is filed. *See Zapata,* 430 A.2d at 787–88. In either circumstance, the *Zapata* court reasoned, a court is called to exercise independent judgment over the party's request to terminate the action.

determine, applying its **own independent business judgment,** whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. [This independent review] is intended to thwart instances where corporate actions meet the criteria of [business judgment rule], but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest. The Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit. The Court of Chancery should, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests.

(Emphasis added.) (Quotations omitted.)

*Id.* at 788–89. In embracing involvement by the courts, the *Zapata* court "recognize[d] the danger of judicial overreaching" but further concluded that this independent review provided "the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee." *Id.* at 788–89. It further reasoned that review under the strict business judgment rule "would in the name of practicality and judicial economy foreclose a judicial decision on the merits," a result it found unnecessary and undesirable. *Id.* at 788.

In the aftermath of *Zapata* and *Auerbach,* courts reviewing motions to dismiss or for summary judgment were presented with two alternatives: *Auerbach's* adherence to the business judgment rule or *Zapata's* belief that the SLC process should be independently examined, on the merits, by the courts.[29]

---

**29.** In *Miller v. Register and Tribune Syndicate, Inc.,* 336 N.W.2d 709 (Iowa 1983), the Iowa Supreme Court adopted a prophylactic rule as a means of circumventing the "structural bias" inherent in the committee

Many courts hewed to the business judgment rule, adopting a standard like that in *Auerbach.* *See Roberts v. Alabama Power Co.,* 404 So.2d 629, 632, 636 (Ala.1981) (rejecting *Zapata* [30] and stating that, "after a thorough and good faith determination [by the SLC] that [the] suit would not be in the best interest of the corporation[, allowing] a suit . . . would be to substitute the judgment of the court . . . for that of the [SLC,] when it is obvious that the [SLC is] best situated to make such a determination"); [31] *Skoglund v. Brady,* 541 N.W.2d 17, 22 (Minn.Ct.App.1995) (examining only whether committee request to dismiss "was made by an independent committee that conducted its investigation in good faith"); *Miller v. Bargaheiser,* 70 Ohio App.3d 702, 591 N.E.2d 1339, 1342–43 (1990) (recognizing the "legitimacy of the concerns voiced in *Zapata* [,]" but concluding that *Zapata's* "degree of scrutiny to be irreconcilable with the spirit of the business judgment rule."). Some federal courts, interpreting the laws of other states, similarly concluded that the business judgment rule should control. *See Gaines v. Haughton,* 645 F.2d 761, 770–72 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982), *overruled on other grounds by Stahl v. Gibraltar Fin. Corp.,* 967 F.2d 335, 336–38 (9th Cir.1992) (applying California law); *Genzer v. Cunningham,* 498 F.Supp. 682, 687–89 (D.Mich.1980) (applying Michigan law).

appointment process. Under *Miller,* directors charged with misconduct are prohibited from selecting SLCs.

**30.** The *Roberts* court actually referenced the lower court decision in *Zapata v. Maldonado,* then designated as *Maldonado v. Flynn,* 413 A.2d 1251 (Del.Ch.1980).

**31.** The *Roberts* Court made an important distinction in response to the shareholder's argument that no director, independent or otherwise, could give the corporation's approval of illegal actions:

When an independent committee composed of disinterested directors decides not to bring an action on behalf of the corporation, the directors are not authorizing or condoning the alleged wrongful acts but are merely saying that given the fact that the events did occur, it is not in the best interest of the corporation to pursue a legal remedy.

*Roberts v. Alabama Power Co.,* 404 So.2d 629, 632 (Ala.1981).

The Pennsylvania Supreme Court, in *Cuker v. Mikalauskas*, 547 Pa. 600, 692 A.2d 1042 (1997), strongly rejected *Zapata*, warning that allowing a court to apply "its own business judgment" was a "defect which could eviscerate the business judgment rule[.]" *Id.* at 1049. Instead, the Pennsylvania court adopted a standard in which, similar to the standard of *Auerbach*, courts avoided reviewing the substance of the SLC decision, and focused on the process:

> [A] court must examine the circumstances surrounding the decisions in order to determine if the conditions warrant application of the business judgment rule. If they do, the court will never proceed to an examination of the merits of the challenged decisions, for that is precisely what the business judgment rule prohibits.

*Id.* at 1048.

In contrast, some states have agreed with Delaware that the traditional business judgment rule does not suffice when reviewing a motion to dismiss a derivative complaint based on an SLC's report. North Carolina, for example, after temporarily adopting *Auerbach's* inquiry, changed course and endorsed the *Zapata* approach. *Compare Alford v. Shaw*, 318 N.C. 289, 349 S.E.2d 41, 52, 56 (1986) (adopting *Auerbach* approach), *with Alford v. Shaw*, 320 N.C. 465, 358 S.E.2d 323, 324 (1987) (withdrawing earlier opinion). In the later iteration of *Alford*, the court was swayed by concerns over the inadequacy of SLC investigations:

> We interpret the trend away from *Auerbach* among other jurisdictions as an indication of growing concern about the deficiencies inherent in a rule giving great deference to the decisions of a corporate committee whose institutional symbiosis with the corporation necessarily affects its ability to render a decision that fairly considers the interest of plaintiffs forced to bring suit on behalf of the corporation. Such concerns are legitimate ones and, upon further reflection, we find that they must be resolved not by slavish adherence to the business judgment rule.... We conclude ... that a modified *Zapata* rule, requiring judicial scrutiny of the merits of the litigation committee's recommendation, is most

consistent with the intent of our legislature and is therefore the appropriate rule to be applied in our courts.

(Citations omitted.)

*Id.* at 326.

After *Zapata,* federal courts construing the state law of Connecticut, Georgia, Iowa, and Virginia applied a *Zapata* inquiry. *See Joy v. North,* 692 F.2d 880, 891 (2d Cir.1982) (concluding that Connecticut would adopt *Zapata* rule), *superseded by statute,* Conn. Gen.Stat. Ann. § 33–724; *Peller v. Southern Co.,* 911 F.2d 1532, 1536, 1538 (11th Cir.1990) (concluding that Georgia would follow Delaware case law); *Watts v. Des Moines Register & Tribune,* 525 F.Supp. 1311, 1326 (S.D.Iowa 1981) ("[T]he Court is persuaded that the Iowa Supreme Court would apply the more stringent version of the deferential business judgment rule expounded by [*Zapata* ]."); *Abella v. Universal Leaf Tobacco Co.,* 546 F.Supp. 795, 797– 800 (E.D.Va.1982) ("The Court is persuaded that the *Zapata* approach adequately safeguards the competing interests at stake and that Virginia has no need for, nor would it follow, a more restrictive approach."). Maryland, however, has yet to definitively decide whether courts should follow *Zapata* or *Auerbach.*[32]

Some courts have characterized the *Auerbach* standard as one of minimal scrutiny. For example, the *Alford* court

---

**32.** In a previous case, the Court of Special Appeals has marked a course similar to the *Auerbach* approach. *See Bender v. Schwartz,* 172 Md.App. 648, 666, 917 A.2d 142, 152 (2007) (stating that a court reviewing a corporation's motion dismiss must defer "to the decision of the board or committee not to pursue litigation unless the stockholders can show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment"). Two federal courts, applying Maryland law, have reached opposite conclusions as to which approach Maryland would follow. *Compare Grossman v. Johnson,* 89 F.R.D. 656, 663 (D.Mass.1981), *aff'd on other grounds,* 674 F.2d 115 (1st Cir.1982) (concluding "that Maryland courts would most likely follow th[e] [*Auerbach* ] trend and permit a business judgment to terminate a suit"), *with Rosengarten v. Buckley,* 613 F.Supp. 1493, 1500 (D.Md.1985) ("[T]he court finds that Maryland would be likely to apply the *Zapata* test to the instant case.").

characterized the *Auerbach* approach as a "slavish adherence to the business judgment rule" which necessarily requires "great deference" to the corporation. *Alford,* 358 S.E.2d at 326. In *Abella,* the court recognized the "relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation." *Abella,* 546 F.Supp. at 799. In *Rosengarten v. Buckley,* 613 F.Supp. 1493, 1500 (D.Md.1985), the district court, applying Maryland law, posited that the *Auerbach* approach "does not acknowledge the structural bias inherent in a system which allows directors to judge the actions of their fellow directors." Indeed, John and Kevin seemingly advance this view of the *Auerbach* approach, arguing that, without an independent *Zapata* inquiry, a court would "simply sign off on a litigation committee's decision," and warning that "legitimate complaints of minority shareholders will be subject to summary dismissal based upon reports from committees chosen by the accused without *any reasonable judicial review.*" (Emphasis added).[33]

We disagree, however, that *Auerbach's* inquiry must necessarily be a "rubber stamp" review. Although *Auerbach* held that an SLC's *substantive decisions* are presumed reasonable, it did not presume that the SLC was independent, acted in good faith, or followed reasonable procedures. We conclude that there should be no presumption on these issues. Rather, the court should not grant summary judgment on the basis of an SLC's decision unless the directors have stated how they chose the SLC members and come forward with some evidence that the SLC followed reasonable procedures and that no substantial business or

---

**33.** This view of the debate between *Auerbach* and *Zapata* most likely arises from restrictive and cautionary language in *Auerbach* and its progeny in rejecting judicial review of substantive business decisions. *Auerbach* seemed to set an extremely high bar for derivative plaintiffs, requiring proof that "the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham ... [thus raising] questions of good faith or conceivably fraud[.]" 419 N.Y.S.2d 920, 393 N.E.2d at 1003.

personal relationships impugned the SLC's independence and good faith. This places a minimal burden on the directors, as these assertions can be made in an affidavit. If the corporate directors have met this burden, then the burden shifts to the derivative plaintiffs to come forward with evidence regarding these issues sufficient to survive summary judgment. If the plaintiff survives summary judgment, at trial, the burden is on the directors to prove that the SLC was independent, acted in good faith, and made a reasonable investigation and principled, factually supported conclusions.[34] *See Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1001 ("We examine then the proof submitted by defendants" on the issue of the SLC's "disinterested independence."); *Booth Family Trust v. Jeffries,* 640 F.3d 134, 146 (6th Cir.2011) (SLCs "are not presumed to be independent, and the [SLC] must prove its independence 'beyond reproach.' In light of [an SLC member's] recusal, we are left with strong doubts as to the [SLC's] independence and cannot conclude that [the corporation] has clearly demonstrated its [SLC's] independence."); *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372, 379 (6th Cir.1984) ("[T]he corporation has not met its burden of demonstrating the good faith and disinterestedness of [the] committee."); *Genzer v. Cunningham,* 498 F.Supp. 682, 693 (E.D.Mich.1980) (applying Michigan law, and stating "[t]he court must finally consider whether the defendants have established, as a matter of law, that the [SLC] acted independently and in good faith"); *Beam v. Stewart,* 845 A.2d 1040, 1055 (Del.2004) (holding that "the SLC has the burden of establishing its own independence by a yardstick that must be 'like Caesar's wife'-'above reproach' "); *Lewis v. Fuqua,* 502 A.2d 962, 967 (Del.Ch.1985) ("The only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit. A defendant who desires to avail

---

**34.** Because *Auerbach* and *Zapata* agree on the need for judicial review of the SLC's independence, *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372, 376 (6th Cir.1984), cases applying *Zapata* are also instructive on the independence inquiry.

itself of this unique power to self destruct a suit brought against it ought to make certain that the [SLC] is truly independent. If a single member committee is to be used, the member should, like Caesar's wife, be above reproach."); *In re UnitedHealth Group Inc. S'holder Derivative Litig.,* 754 N.W.2d 544, 554 (Minn.2008) ("At a minimum, the board must establish that the committee acted in good faith and was sufficiently independent from the board of directors to dispassionately review the derivative lawsuit."). The court's review, though not on the merits, can be rigorous on the questions of good faith, independence, and procedure.

 Regarding the first prong of the *Auerbach* inquiry (the SLC's independence and good faith), judicial inquiry can involve an investigation of the SLC's composition and its members' relation to the director-defendants. *Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1002–03 (stating that courts should examine the SLC's "disinterested independence" and "the adequacy and appropriateness of the committee's investigative procedures and methodologies"); *Miller,* 591 N.E.2d at 1343 (rejecting *Zapata* and limiting inquiry to whether "(1) the SLC is comprised of independent, disinterested trustees; (2) the SLC conducts its inquiry in good faith; and (3) the committee's recommendation is the product of a thorough investigation"); *see also Hasan,* 729 F.2d at 378 (describing that although *Auerbach* and *Zapata* "diverge on the issue of the judicial deference appropriate to the substantive business judgments of a special committee, **they are convergent in their approach to the issues of good faith and thoroughness**") (emphasis added).

 Examining cases that analyze an SLC's independence, we observe that the inquiry, although not substantive, can be rigorous. For example, in *In re Oracle Corp. Derivative Litig.,* 824 A.2d 917 (Del.Ch.2003), the Delaware Court of Chancery[35] first outlined the breadth of the independence inquiry, summarizing the standard as follows:

---

**35.** *Oracle* supports our position even though it follows *Zapata* because "[n]either the *Auerbach* approach nor the *Zapata* approach allows a

At bottom, the question of independence turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind. That is, the [courts should] ultimately focus on impartiality and objectivity.

* * *

For all these reasons, the independence inquiry is critically important if the [SLC] process is to retain its integrity, a quality that is, in turn, essential to the utility of that process. . . .

* * *

. . . The composition and conduct of [an SLC] therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectivity.

* * *

. . . Just as there are obvious dangers from investigators suffering from too much zeal, so too are dangers posed by investigators who harbor reasons not to pursue the investigation's targets with full vigor.

The nature of the investigation is important, too. Here, for example, the SLC was required to undertake an investigation that could not avoid a consideration of the subjective state of mind of the Trading Defendants. Their credibility was important, and the SLC could not escape making judgments about that, no matter how objective the criteria the SLC attempted to use.

Therefore, [the court] necessarily measure[s] the SLC's independence contextually, and [the court's] ruling confronts the SLC's ability to decide impartially whether the Trading Defendants should be pursued. . . . This contextual approach is a strength of our law, as even the best minds have yet to devise across-the-board definitions that capture all

---

reviewing court to extend to the members of a special litigation committee the presumption of good faith and disinterestedness." *Hasan,* 729 F.2d at 376.

the circumstances in which the independence of directors might reasonably be questioned.

*Id.* at 938–41 (citations omitted).[36] After setting forth this standard, the court engaged in an extended discussion of the relationship of the SLC members with the defendant directors, and concluded that the SLC was not independent. *See id.* at 940–48. *See also Hasan,* 729 F.2d at 379 (concluding that the SLC members, who had a previous business relationship with the defendants, had not convinced the court of their "independence."); *Holmstrom v. Coastal Indus., Inc.,* 645 F.Supp. 963, 988 (N.D.Ohio 1984) (court was unable to conclude that committee was independent because of circumstances surrounding the recruitment of the committee members, and the members' inability to explain their investigation); *Houle v. Low,* 407 Mass. 810, 556 N.E.2d 51, 59 (1990) (remanding for further factfinding regarding independence

---

**36.** As support for this standard, the *Oracle* court recognized the many practical influences which could affect an SLC's "independence," and rejected an inquiry only into the corporations "dominion and control" over the SLC:

> Delaware law should not be based on a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. *Homo sapiens* is not merely *homo economicus*. We may be thankful that an array of other motivations exist that influence human behavior; not all are any better than greed or avarice, think of envy, to name just one. But also think of motives like love, friendship, and collegiality, think of those among us who direct their behavior as best they can on a guiding creed or set of moral values.
>
> Nor should our law ignore the social nature of humans. To be direct, corporate directors are generally the sort of people deeply enmeshed in social institutions. Such institutions have norms, expectations that, explicitly and implicitly, influence and channel the behavior of those who participate in their operation. Some things are "just not done," or only at a cost, which might not be so severe as a loss of position, but may involve a loss of standing in the institution. In being appropriately sensitive to this factor, our law also cannot assume—absent some proof of the point—that corporate directors are, as a general matter, persons of unusual social bravery, who operate heedless to the inhibitions that social norms generate for ordinary folk.
>
> (Footnotes omitted.)

*In re Oracle Corp. Derivative Litig.,* 824 A.2d 917, 938 (Del.Ch.2003).

when lone member of SLC was junior to director defendants and depended on them for advancement in her career).

*Oracle* exemplifies the "teeth" that the independence inquiry can have when there are significant questions regarding the SLC's relationship with the directors. The *Oracle* court, however, dealt with a particularly complex network of social influence and interaction. As a practical matter, we cannot expect as detailed and prolonged of a factual analysis from the trial court in every case.

■■■ Regarding the second prong of the *Auerbach* inquiry (the reasonableness of the SLC's methodology), the reviewing court inquires into the procedural aspects of the SLC's investigation:

> [T]he court may properly inquire as to the adequacy and appropriateness of the committee's investigative procedures and methodologies[.] ... [T]hose responsible for the procedures by which the business judgment is reached may reasonably be required to show that they have pursued their chosen investigative methods in good faith. What evidentiary proof may be required to this end will, of course, depend on the nature of the particular investigation, and the proper reach of disclosure at the instance of the shareholders will in turn relate inversely to the showing made by the corporate representatives themselves. The latter may be expected to show that the areas and subjects to be examined are reasonably complete and that there has been a good-faith pursuit of inquiry into such areas and subjects. What has been uncovered and the relative weight accorded in evaluating and balancing the several factors and considerations are beyond the scope of judicial concern. Proof, however, that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consistent with the principles underlying the application of the business judgment doctrine, would raise questions of good faith

or conceivably fraud which would never be shielded by that doctrine.

*Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1002–03.

Although this line of inquiry does not address the merits of the SLC decision, it can still set a high bar for the SLC. For example, in *Peller v. S. Co.,*[37] 707 F.Supp. 525 (N.D.Ga.1988), *aff'd, Peller v. S. Co.,* 911 F.2d 1532 (11th Cir.1990), a federal district court found that an SLC had not acted in good faith, despite conducting a thorough investigation:

> The court finds that the investigation undertaken was thorough. Nonetheless, the court continues to be troubled by the fact that the [SLC] relied almost exclusively on [independent counsel] to conduct the substantive aspects of the investigation. . . . The conduct of the interviews is a most important factor in determining whether the [SLC] pursued its charge with diligence and zeal, or whether it played softball with critical players. Plaintiff has not been given an opportunity to review the annotated summaries of interviews prepared by [independent counsel]. Thus, by relying on counsel to outline and to conduct all interviews and then prepare interview summaries that contain "privileged information", the [SLC] has insulated its investigation from scrutiny by plaintiff. This is not good faith. (Citations omitted.)

*Peller,* 707 F.Supp. at 529; *see also Hasan,* 729 F.2d at 380 (concluding that the investigation carried out by the SLC was "procedurally infirm" and thus not entitled to any deference).

As these cases demonstrate, courts applying a limited review of an SLC decision have been willing and able to find deficiencies in the SLC's process when appropriate. Accordingly, we believe that the proposition that a court must decide between a *Zapata* review and no review at all overlooks the most appropriate standard of review. Indeed, other courts employing the business judgment rule to SLC decisions have

---

**37.** Again, although the *Peller* court applied *Zapata,* the discussions contained herein regard the first step of the *Zapata* inquiry, which for our purposes is indistinguishable from the *Auerbach* inquiry.

similarly concluded. In rejecting *Zapata,* the Alabama Supreme Court stated:

> We do not feel that the rule we adopt today will be the death knell of shareholder derivative suits in Alabama. The action of the board and the committee will still be subject to judicial scrutiny as to whether their action was in the best interest of the corporation and whether such determination was made independently and in good faith. If the court finds the action to have been done otherwise, then the case may proceed. (Citation omitted.)

*Roberts,* 404 So.2d at 636. Similarly, the *Miller* court concluded:

> We are confident that the diligent [review of the SLC's independence, disinterestedness, good faith, and thoroughness] [38] ... will satisfactorily strike the balance sought by the court in *Zapata* while remaining consistent with the business judgment rule.

*Miller,* 591 N.E.2d at 1343.

We further observe that some of *Zapata's* most fervent advocates have applied a "merits" review which could have adequately been accomplished under *Auerbach's* "procedural" review. For example, in *Alford,* the North Carolina Supreme Court, in adopting *Zapata* and reversing the trial court's grant of a motion to dismiss a derivative complaint, remanded to the trial court with instructions that it follow the following procedure:

> Upon remand plaintiffs shall be permitted to develop and present evidence on this issue, such as: (1) that the committee, though perhaps disinterested and independent, may not

---

**38.** Rather than naming *Auerbach,* the *Miller* court referred to Ohio's "traditional" approach, citing *Holmstrom v. Coastal Indus., Inc.* 645 F.Supp. 963 (N.D.Ohio 1984). In *Holmstrom,* the court stated that review of an SLC decision should be limited as to whether "the committee is composed of independent or disinterested directors and their recommendation is the product of a good faith and thorough study of the issues regarding [whether] it is in the best interest of the corporation to pursue or to terminate the litigation." *Holmstrom,* 645 F.Supp. at 965. The *Holmstrom* approach is thus the equivalent of the *Auerbach* approach.

have been *qualified* to assess intricate and allegedly false tax and accounting information supplied to it by those within the corporate structure who would benefit from decisions not to proceed with litigation, (2) that, in fact, false and/or incomplete information was supplied to the committee because of the nonadversarial way in which it gathered and evaluated information, and therefore (3) in light of these and other problems which arise from the structural bias inherent in the use of the board-appointed [SLCs], that the committee's decision with respect to the litigation eviscerates plaintiff's opportunities as minority shareholders to vindicate their rights[.]

*Alford,* 358 S.E.2d at 328. In this passage, the *Alford* court thus identified the need to inquire into (1) the qualifications of the committee, (2) the adequacy of their investigation and the accuracy of information provided, and (3) any structural bias built into the SLC appointment process. Although purporting to be a *Zapata* inquiry, the inquiry actually ordered by the *Alford* court is merely a thorough version of the procedural inquiry under *Auerbach.*

Given the level of scrutiny attainable under an inquiry into the SLC's independence and methodology, we are not persuaded by the pronouncement of some courts that adherence to the business judgment rule is wholly inadequate to protect shareholders rights. Instead, we conclude that a procedural review under the business judgment rule, although clearly the more deferential standard, nonetheless provides for a thorough review of an SLC's independence, good faith, and methodology, and such inquiry gives trial courts the ability to scrutinize SLC decisions and protect shareholders against collusive practices or inadequate investigations. Moreover, this approach protects against the danger of judicial overreach and "avoid[s] the problem in the second level of the *Zapata* test, which requires the judge to exercise his or her own business judgment." *Houle,* 556 N.E.2d at 59.[39] To the

---

39. Additionally, as the Ohio courts stated in *Miller,* we do not intend to hold an SLC to an impossible standard:

extent that our view of the inquiry a court should make, as set forth above, differs from the traditional *Auerbach* standard, it should be considered an "enhanced *Auerbach*."

One clear example of an SLC's unreasonable methodology is when the SLC itself defers to the decision of the directors, instead of making its own independent review of the transactions in question. In these situations, the SLC has cast aside its duty to conduct an independent review, and the directors cannot rely on its report for summary judgment. *See, e.g., Roberts,* 404 So.2d at 632–33 ("Upon finding that a special committee of disinterested directors has determined in good faith and after a *thorough investigation* that it is not in the company's best interests to allow an action to proceed, [the 'business judgment' rule] would not allow the courts to interfere with the committee's determination.") (emphasis added); *Hirsch v. Jones Intercable, Inc.,* 984 P.2d 629, 638 (Colo.1999) ("The purpose to be served by any [SLC] is to *substitute its independent . . . judgment* for the judgment of the directors who have been accused of wrongdoing.") (emphasis added); *Einhorn v. Culea,* 235 Wis.2d 646, 612 N.W.2d 78, 84 (2000) ("If the [SLC] is independent from the alleged wrongdoers, acts in good faith and conducts a *reasonable inquiry upon*

---

> This is not a perfect world. To expect an SLC to inquire into the activities of the defendants named in a derivative action and find absolutely no evidence of misconduct or not even the appearance of impropriety is not realistic. Indeed there are few among us who never make a misstep, who never have a momentary lapse and then in hindsight realize that what was done was not entirely appropriate. However, it is not the job of this committee to sniff out every particle of misconduct attributable to these named defendants and submit all to the court and jury for final evaluation. The committee must determine what is in the best interests of the corporation and then recommend a course of action to the trial court for the disposition of the derivative action. If the committee determines that certain misconduct should be corrected by action within the corporation rather than in the public arena of the courtroom, then a recommendation to dismiss the lawsuit should be made and such action will not be seen as cover-up or as evidence of an incomplete or a bad faith investigation.
>
> *Miller v. Bargaheiser,* 70 Ohio App.3d 702, 591 N.E.2d 1339, 1344 (1990).

*which its conclusion is based,* the committee's recommendation not to proceed with a derivative action is viewed as a proper exercise of the directors' business judgment and the court will dismiss the action.") (emphasis added).

Thus, Maryland courts should limit their inquiry. As in *Auerbach,* the SLC's substantive conclusions are entitled to judicial deference, provided that the SLC was independent, acted in good faith, and made a reasonable investigation and principled, factually supported conclusions. We emphasize, however, that the directors are entitled to no presumption regarding the above requirements. To create grounds for summary judgment, the directors must state how they chose the SLC members and come forward with some evidence that the SLC conducted a reasonable inquiry upon which its conclusion is based and that no significant business or personal relationships impugned the SLC's independence and good-faith, factual basis. Only then will the court have sufficient grounds to grant summary judgment on the basis of the SLC's report. Moreover, the plaintiff can still avoid summary judgment by presenting a genuine issue of material fact regarding these issues, in which case judicial review should be engaged and thorough. Such review is consistent with *Auerbach* and Maryland's business judgment rule, which "can be claimed only by *disinterested* directors whose conduct otherwise meets the tests of business judgment." *Werbowsky* 362 Md. at 609, 766 A.2d at 138 (emphasis added).[40]

---

**40.** For further procedural guidance, we refer the courts to one Delaware Court's detailed description of its *first part* of the *Zapata* test—the inquiry into the independence, good faith, and procedures of an SLC (which is identical to *Auerbach's* treatment of this issue, *see Hasan,* 729 F.2d at 376–78):

> Despite the fact . . . that the motion is not strictly one for summary judgment . . . it is to be handled procedurally in a manner akin to proceedings on summary judgment in two respects:
> (1) Each side (and as to the motion this means the plaintiff on the one hand and the corporation through its representative, the [SLC]—and not the other defendants—on the other) shall have an opportunity to make a record on the motion. (Presumably, this means by supplementing the pleadings with affidavits and/or veri-

John and Kevin have argued that we should abandon the SLC process altogether. In a motion to the Circuit Court on March 3, 2008, John and Kevin expressed their views on the SLC process as follows:

[The SLC process] is itself subject to abuse by corporate management, as the accused themselves hand-pick the members of the committee who will investigate the allegations. It is not surprising then that most often these hand-picked committees "report" that the claims are not meritorious and the corporations then ask the court to dismiss the action based upon the report. That has happened here.

Similarly, before this Court, John and Kevin argued at length that the SLC process itself created bias, analogizing that process to "forum-shopping":

[C]ourts which prohibit and "universally condemn" judge-shopping by attorneys, blithely approve a litigation committee process to resolve serious shareholder grievances that authorizes the accused directors to choose their own extra-judicial tribunal. . . . [We] submit that just as a litigant can readily find an "independent, qualified and objective expert" to support any position, a competent director may also find an "independent, qualified, and competent business person" to sanction the directors' challenged misconduct as an act of reasonable business judgment.

To be sure, John and Kevin's point addresses a valid issue, and one which we should not completely ignore. We acknowledge the likelihood that an SLC, more often than not, will side with the corporation, rather than the shareholders, in its conclusions. The correct response, however, is not to abandon

---

fied documents, and, as hereafter noted, by such other discovery as may be permitted by the Court).

(2) As to the limited issues presented by the motion, the corporation (through the Committee), as the moving party, has the normal burden imposed on a moving party [under summary judgment standards] of demonstrating that there is no genuine issue as to any material fact and that the corporation is entitled to dismiss the complaint as a matter of law.

*Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del.Ch.1984).

the SLC process altogether. We reaffirm our belief that the SLC process, when coupled with the thorough standard of judicial review we have described above, provides significant protection for minority shareholders. Under this inquiry, the court may examine any significant formal or informal relationship between the parties, including societal or personal influences. Whatever the SLC's conclusion may be, the process itself requires near-complete transparency from the directors and increases their accountability for their decisions.

### III.

We now apply the above standards to the Circuit Court's review of the SLC opinion in this case.

### A. The SLC's Independence and Good Faith

Under our standard of review, the circuit court must first conclude that the SLC was independent and acted in good faith. As explained above, the SLC members are entitled to no presumption of independence and good faith, and the corporations must state in a motion for summary judgment how they chose the SLC members and come forward with some evidence that no significant relationships or influences impugned their "disinterested independence." *See Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1003. If the plaintiff, in responding, comes forward with evidence of such relationships or influences, the court should then consider whether there is a genuine issue of material fact regarding independence or good faith.

Here, the directors never attested to how they chose the SLC members or that the SLC members had no significant business, personal, or social relationships with the directors. Instead, they argued that the SLC was entitled to a presumption of independence and good faith, and from then on simply stated, without proving, that the SLC was independent. Thus, as explained above, the Circuit Court did not have sufficient grounds for summary judgment on the basis of the SLC's report, and we therefore vacate its judgment and remand for

further proceedings. On remand, to create sufficient grounds
on this issue, the directors would need to state how they chose
the SLC members and assert that no significant business,
personal, or social relationships impugned the SLC's indepen-
dence or good faith. Then, if the plaintiffs raises a genuine
issue of material fact, the court should complete a thorough
investigation.[41]

---

**41.** Although we remand on this issue solely because the directors did
not make the statements of independence and good faith necessary to
support a motion for summary judgment, we observe as well that the
Circuit Court's inquiry into the SLC's independence and good faith was
improperly narrow. Specifically, the court failed to address whether
the directors had any significant business, social, or personal relation-
ships with the SLC members. The court's analysis on this point is, in
its entirety, as follows:

Upon the demand by John and Kevin, the Board of BTA and BTS
set up a special litigation committee to investigate the merits of John
and Kevin's allegations. Neither member of the SLC has been a
Director of BTA or BTS, nor has either ever been employed by, done
business with or provided services for either corporation. Both
members of the SLC are highly experienced in business and corpo-
rate affairs. Additionally, the SLC retained independent counsel ...
to assist in the review of the derivative suit and the preparation of
their report. [Counsel] has never done business with or provided
professional services for either BTA and BTS and has no future plans
or future opportunity to do so.

The SLC conducted a comprehensive investigation lasting approxi-
mately 5 months. A 30 page Report with one appendix and 32
exhibits was produced as a result of the SLC's thorough examination
of Plaintiff's claims. The Court, thus, finds that the SLC is indepen-
dent from BTA and BTS's Boards of Directors and conducted its
investigation in good faith.

We think the SLC report itself suggests the need for the directors to
come forward with some evidence supporting the independence and
good faith of the SLC. Near the end of its report, the SLC raised, by
itself the issue—the "Adequacy of the Plaintiffs as Shareholder Repre-
sentatives." After listing the factors a court usually considers, the SLC
stated: "Here, the majority shareholders disagree with the Plaintiffs
and it is therefore obvious that they do not adequately represent all the
shareholders." This reasoning is faulty because such a standard would
effectively preclude *all* suits by minority shareholders in a close corpo-
ration. The suddenness of this conclusion, raised *sua sponte* by the
SLC, invokes the question of whether the SLC was objectively consider-
ing the claims presented, or whether it had adopted the hostile attitude
of the defendants in considering these claims.

As potential evidence of this latter possibility, the SLC, although
claiming that it "has not attempted to nor could it understand the

In determining whether the SLC was sufficiently independent from the defendant-directors, the court should first consider any significant business relationship or affiliations between the SLC members and the defendant directors. *See Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1001 (examining whether SLC members had "any prior affiliation with the corporation"); *Hasan,* 729 F.2d at 378–79 (holding that prior business relationships between SLC member and the defendants prevented a finding of independence). The court may also take notice of informal business influences and incentives potentially affecting the SLC. For example, in *Hasan,* the court observed that an SLC member, who was "a founding principal and 25% owner of a leasing and management company, also has a keen interest in attracting real estate developers." *Hasan,* 729 F.2d at 379. Since one of the defendants

---

complicated family dynamics in play[,]'' opted to descend into the intra-family struggle:

> [I]t is clear that the derivative claims appear to be pursued for reasons other than their merit. The Plaintiffs' purpose seems to be to gain leverage in their personal efforts to change the provisions of the SPAs or obtain new agreements with terms they desire to further their perception of personal and family purposes in the future ownership and management of the corporations. *See* letter of February 17, 2002 from Kevin Boland to Louis Boland, Sr., attached as Exhibit 33, describing his views and purportedly those of the other Plaintiff as well that:
>
>> There is real resentment that Jimmy has so much power on whether the company ever gets sold. Jimmy has told some of us that it is his dream to someday run the family business. For the younger half of the family, his dream is our nightmare.
>
> These views are directly opposite those of Louis Boland, Sr., who had three years before penned his Letter of Instruction ... in which he [stated his intention to have James take over as president and chief operating officer.]
>
> It is apparent from the success of the corporations to date that Louis Boland, Sr. made the right choice.... From the corporations' standpoint ... the best choice has been made and they should be free to manage with as little disruption outside of business considerations as possible.

The SLC's conclusion that John and Kevin's deceased father chose the right children to run the business, and its casual identification of a hidden agenda, is unnecessary for an independent committee tasked with making an objective decision for the corporation about a stock transaction benefitting some of the directors.

was a prominent real estate developer, the court questioned whether that SLC member was independent, as he may have had a strong incentive to stay on good terms with the defendants. *Id.*

The independence inquiry should not end with an examination of business relationships. In some instances, the plaintiff can raise a genuine issue of material fact regarding the SLC's independence and good faith by presenting evidence of significant personal or social relationships. For example, the Delaware courts, whose "independence" inquiry we find persuasive in crafting our standards,[42] have recognized that corporate directors often share a parallel network of influence and relationships in the fundraising world, which, in some cases, may undermine an SLC member's ability to render an independent decision. *See, e.g., Lewis,* 502 A.2d at 966–67 (concluding that a $10 million charitable pledge from a corporate CEO to the university of which an SLC member was president raised an issue of "potential conflicts of interest or divided loyalties [that], when considered as a whole, raise a question of fact as to whether [the SLC] could act independently"); *In re Oracle,* 824 A.2d at 930–33 (questioning independence of SLC members when defendants had made millions of dollars of donations to the members' university).[43]

Finally, although we have declined John and Kevin's suggestion that we recognize a *per se* bias arising from the SLC appointment process, the court may properly examine the specific circumstances surrounding the selection and delegation of responsibility to the SLC in determining whether it has shown its independence. For example, in *Biondi v. Scrushy,* 820 A.2d 1148 (Del.Ch.2003), the Delaware Court of

---

**42.** Of course, Delaware's independence and procedural inquiry is just one of its two steps, under *Zapata.*

**43.** *But see In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 359 (Del.Ch.1998) (holding that despite $1 million in donations from corporate CEO to university at which corporate director was president, there was "no reasonable doubt as to the independence of [the SLC]"), *aff'd in part, rev'd in part sub nom. Brehm v. Eisner,* 746 A.2d 244 (Del.2000).

Chancery relied on "an odd confluence of unusual and highly troubling facts" regarding the appointment of the SLC to determine that it could not show its own independence. *Id.* at 1165–66. Specifically, the *Biondi* Court observed that an "at best, begrudging and, at worst, inadequate, original delegation of authority" to the SLC, when coupled with repeated public pronouncements of support for the defendants by corporate members (including the SLC chairman) during the investigation, created "a reasonable doubt that its investigation was designed to paper a decision that had already been made." *Id.* As this discussion shows, not all SLC appointment processes are equal.

 The court should require that the directors at least attest to the lack of a significant business, personal, or social relationship with the SLC members and state why they chose the SLC members and how they learned of them. Inquiring only into the SLC members' formal or financial ties with the defendants is inadequate. Nonetheless, the independence inquiry does not require the directors to show, beyond all doubt, that no conceivable theory of influence exists between them and the SLC.[44] The defendants should state the nature of their prior relations with the SLC members. The defendants should address whether the SLC members have any joint pursuits outside of the business world, whether in recreational, social, religious, or non-profit organizations. Once the court has this information, it should be able to determine whether there were any further questions regarding the ability of the SLC to render an independent opinion on behalf of the corporation. But these questions must be addressed, and therefore we remand.

### B. *The Reasonableness of the SLC's Methodology*

John and Kevin challenged the procedure adopted by the SLC in this case with multiple allegations. Generally, John

---

**44.** Of course, a mere acquaintance of a party would not be disqualified from serving on a special litigation committee, and prior service on another board or commission would not show *per se* bias.

and Kevin argued that the SLC report was superficial and devoid of details. More specifically, John and Kevin challenged the scope of the SLC's investigation and charged that it provided a deferential standard of review:

> The committee sought to avoid a substantive review of the merits of the transaction by applying a "business judgment rule" level of review to the transaction and the director-defendants' asserted justifications for it. But, the business judgment rule is inapplicable to self-dealing, interested director transactions. . . . Thus . . . the committee applied an improper standard of review and, for this reason alone, the committee report may not support a motion to dismiss the complaint.

On this point, John and Kevin further averred that "[t]he committee could not identify any standard that they used to measure the asserted "reasonableness" of the self-aggrandizing transaction." As explained below, the SLC report itself created a genuine issue of material fact regarding the reasonableness of the SLC's methodology, and the court therefore should have examined that methodology in more detail.

 The reviewing court must examine the methodologies and procedures of the SLC's investigation, and whether there was a reasonable basis for its conclusions. Again, the SLC is not entitled to a presumption that its investigation and conclusions were reasonable. Indeed, the court may find evidence of procedural unreasonableness in the report itself. *See Hasan,* 729 F.2d at 378 (holding that the "report itself raises serious questions about the integrity of his committee's findings"). Moreover, the mere length of the report and the sheer volume of items considered should not be given undue weight by the court. Page totals are a shallow metric, especially given the "relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation." *Abella,* 546 F.Supp. at 799. *See also Oracle,* 824 A.2d at 925 (rejecting the SLC's recommendation for failure to show independence, even though the SLC "reviewed an enormous amount of paper and electronic records[,] . . . interviewed

seventy witnesses, some of them twice[,] ... [and] produced an extremely lengthy Report totaling 1,110 pages").

Under our standards, although the court should not question the SLC's substantive conclusions, it should examine what issues the SLC actually set out to address. The SLC cannot arrive at a reasonable answer if addresses the wrong issues. Thus, addressing the wrong issues is an example of unreasonable methodology.

Here, in reviewing the SLC's investigation, the court focused primarily on the sheer volume of the SLC's exhibits and report, stating, in its entirety:

[Independent counsel] and the SLC were provided with approximately 1,716 [pages] of material by the corporations. The SLC conducted a 5 month investigation, during which it interviewed 11 individuals, including John and Kevin, believed to have knowledge regarding the claims in the Derivative Action. The resulting report consists of 30 pages accompanied by one appendix and 32 exhibits. It is clear from the amount of time and effort expended to conduct the investigation and produce a thorough report that the SLC acted in good faith.

Next, the court reviewed the reasonableness of each of the SLC's *findings*, holding they were reasonable.[45]

---

**45.** Regarding the excessive compensation charges, the court stated:

While the compensation packages of the Board Defendants have varied slightly from year to year, they have varied in accordance with the net incomes of the companies. The question of appropriate levels of compensation are well documented by the SLC Report. This is not a situation where Directors are given raises despite poor performance by the companies. Additionally, the Board Defendant's compensation packages conform to industry standards.
(Footnote omitted.)
With respect to the accusations regarding the acquisitions of Mrs. Boland's stock, the Circuit Court stated:
The SLC looked into and scrutinized the way in which the acquisition came about, the reasons for the acquisition, the impact of the acquisition on other shareholders, the impact of the acquisition on the Board Defendants and the fairness of the price. John and Kevin have, thus, failed to rebut the presumption that the SLC's investiga-

█ Applying our above-described standards, we observe that the Circuit Court incorrectly applied a presumption that the SLC's methodology was reasonable. In its December 12, 2008, order and opinion, the Circuit Court referenced, in passing, its duty to inquire into "the process, scope, and thoroughness of work performed by the SLC." The court, however, stated that "the business judgment standard requires this Court to examine the work of the SLC **with the presumption ... that its investigation was conducted within sound business judgment**" (emphasis added), then stated:

> The compensation of Cain and the other Directors was addressed by the SLC, whose decision must now be reviewed under the business judgment standard. The application of the standard is clearly bolstered by the report of the SLC and the compensation of Director Cain is found by this Court to come within the standard.

* * *

[Moreover, the] sale of the stock was a part of an overall executive compensation plan. *Bender, supra,* is cited in support of the exercise of deference to the board's decisions as to the levels of compensation under the business judgment rule. The sale and grant of stock meets this test. **John and Kevin have not alleged fraud or deceit in the Counter–Complaint which requires the examination by**

---

tion was reasonable and that its conclusion is within the realm of sound business judgment.
(Footnote and citations omitted.)
With regard to the allegations regarding the Stock Purchase Agreements, the Court observed:
The SLC considered many factors in deciding whether or not it was in the best interest of the corporations to pursue litigation on this allegation. Such factors include the legal opinion that the SPAs would be found enforceable by the court, the contention to restrain enforcement is designed to cause financial harm to the corporations and the contracts' terms are beneficial to the corporation. Based on the several factors considered, it appears to the Court that the decision to attempt to enforce the SPAs was within the sound business judgment of the corporations.
(Citation omitted.)

the Court of the process, scope and thoroughness of work performed by the SLC.

(Emphasis added.)

As its opinion shows, the court believed that any further investigation into the SLC's report was unnecessary.[46] While courts must defer to the SLC's *substantive conclusions*, they cannot afford any presumption of reasonableness to its methodology.

Because the Circuit Court inappropriately afforded the SLC's methodology a presumption of reasonableness, its analysis on that point was inappropriately framed. The Circuit Court opinion discusses the length and thoroughness of the investigation, and concludes that the SLC did not engage in a cursory analysis. It appears, however, that the Circuit Court did not consider the scope of review and standards used by the SLC. Specifically, it is unclear whether, as John and Kevin allege, the SLC applied a "business judgment standard" to the transactions at issue, or whether they engaged in an independent inquiry on behalf of the corporation. Indeed, a close examination of the SLC's report raises serious questions regarding the standard of review used by the SLC investigation, and seems to suggest that the SLC itself applied a deferential standard to the Board's previous actions, rather than stepping into the shoes of the corporation and making an independent decision. In reviewing the stock sales to the directors, the SLC concluded:

> **The Board determined that the stock sales were to further solidify successful management for the future well being of the corporation.** It goes without saying that it is common for corporations to give stock or stock options as part of compensation. Here, it has the purposes of

---

46. The Circuit Court later reinforced that its decision in the derivative case came because it was satisfied with the work of the SLC. In an April 16, 2009 hearing, the Court stated: "I was confident that the special litigation committee had accorded itself appropriately and had provided the opportunities [for the parties to raise issues; if] I sensed that that was [not] the case, I would not have rendered my opinion in the fashion that I did."

further binding management and encouraging performance to enhance personal dividend income.

\* \* \*

The enhancement of control is a positive benefit for the corporations. **The SLC finds those transactions to be well within the business judgment and done in good faith for the benefit of the corporation.** *See Cummings v. United Artists Theater [Theatre ] Circuit, Inc.,* 237 Md. 1, 22, 204 A.2d 795 (1964); *Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App. 185, 198, 461 A.2d 45, 53 (1983).

> But an issue of the stock that has the collateral effect of enhancing the power of incumbent management is not invalid if the transaction has as its principal purpose some proper corporate goal.

*Mountain Manor Realty, Inc.* [55 Md.App. at 197], 461 A.2d at 52 (quoting *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir.1977)).

Further, the price received for those shares is more than in dollars. It rewards and expects services to be performed for the corporation.

(Emphasis added.)

It is unclear, from the above passage, whether the SLC independently determined that the stock sales were fair to the corporation or, as the emphasized language suggests, merely gave deference to the Board's determination under the business judgment rule.[47]

Comparing the Circuit Court's review with the standards described above, we are unable to give our blessing to its

---

47. Moreover, the SLC summarized its review with the following conclusion: "The duty that is owed by the Director defendants is defined in [CA] § 2–405.1[.] . . . The SLC finds the conduct of the Defendants to have met this standard." That section, a codification of a director's duties to the corporation, is generally invoked as support for applying the business judgment to a corporate board's decision, *see generally Shenker,* 411 Md. at 350, 983 A.2d at 427 (2009) (observing that CA Section 2–405.1 generally "immunize[s] directorial actions from **judicial** scrutiny") (emphasis added), and strongly suggests that the SLC inappropriately limited its investigation.

decision. The report, as submitted, did not provide sufficient explanation of its methodology to allow meaningful judicial review of the methodology's reasonableness. Therefore, the court should not have granted summary judgment, which it apparently did based on a presumption that the SLC's methodology was reasonable. *See Hirsch* 984 P.2d at 636; *Roberts v. Alabama Power Co.*, 404 So.2d at 636. The SLC is entitled to no presumption of reasonableness in this inquiry, and the mere length of the report or volume of items considered will not win the day for the SLC. On remand, the Circuit Court shall analyze the thoroughness of the SLC's investigation and the reasonableness of the methodology it employed, consistent with our above-described standards.

## IV.

We next consider the circuit court's dismissal of John and Kevin's cross-claims on the grounds that they were precluded by *res judicata.*[48] John and Kevin filed a cross-claim alleging individual counts of oppression, which, as we described above, is a direct action. After resolving the derivative suit, the Circuit Court concluded that *res judicata* applied to all of John and Kevin's direct claims, holding that "there was a final judgment, the claims are virtually identical, the parties are the same[,]" and dismissed the cross-claim without reaching the merits.

The doctrine of *res judicata*, or claim preclusion, prevents parties from re-litigating issues that have already been decided by the courts. The doctrine is applicable if the following requirements are met: "[1] if there is a final judgment [on the merits] in a previous litigation [and 2] where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as

---

48. Although, by reversing the Circuit Court's judgment in the derivative action, we have removed the foundation of its *res judicata* finding, we shall address this issue to give guidance to the Circuit Court on remand. *See, e.g., Morris v. State*, 418 Md. 194, 224, 13 A.3d 1206, 1223 (2011) (addressing issues that were briefed so as to provide guidance for the trial court on remand).

to those which could have or should have been raised in the previous litigation." *R & D 2001 v. Rice,* 402 Md. 648, 663, 938 A.2d 839, 848 (2008) (citations omitted).[49]

### 1. Final Judgment On The Merits

■ The doctrine's first requirement, that there be a previous final judgment on the merits, is not met when the earlier case was resolved without a judicial resolution of the factual dispute at issue. For example, in *Williams v. Messick,* 177 Md. 605, 11 A.2d 472 (1940), a derivative suit that followed a "direct action" requesting receivership, we stated that the *res judicata* issue turned on whether the court's termination of the "direct action" involved a factual resolution of the claims. In that previous action, the court denied the plaintiff's request for appointment of a receiver. *See Williams v. Salisbury Ice Co.,* 176 Md. 13, 3 A.2d 507 (1939). In the later action, this Court observed such a judgment could be rendered either on the merits of the plaintiff's claim, or for reasons not related to the merits:

> Of course, an application for a receivership might be denied on either of two grounds; either because it was considered improper to grant it, whatever the complainant's right on the merits of the case averred, or because the rights were not established. And only an adjudication on the second ground would give rise to an estoppel by the decree against asserting those rights again in another action.

(Citations omitted.)

*Messick,* 177 Md. at 611, 11 A.2d at 475. The Court then examined the prior decision, in which it had held that the

---

**49.** Maryland's test for *res judicata* has also been described as a three step analysis, applying when:

> (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.

*R & D 2001 v. Rice,* 402 Md. 648, 663, 938 A.2d 839, 848 (2008) (citations omitted).

complaint did not demonstrate "fraud, spoliation, or imminent danger of the loss of the property" so as to necessitate the appointment of a receiver. *Salisbury Ice Co.*, 176 Md. at 27, 3 A.2d at 514. Because that prior decision was resolved on the merits of the plaintiff's claim, it formed a basis for *res judicata* in the later action. *Messick*, 177 Md. at 612, 11 A.2d at 475. *See also Jessica G. v. Hector M.*, 337 Md. 388, 398–99, 653 A.2d 922, 927–28 (1995) (determining whether an earlier paternity suit by a mother precluded later paternity suit by the child by observing that the dispositive fact in other jurisdictions had been whether the mother's suit was resolved on a *factual finding* of non-paternity, or was resolved on grounds other than the merits); *Cassidy v. Bd. of Educ.*, 316 Md. 50, 52 557 A.2d 227, 228 (1989) (dismissal for failure to allege precondition to lawsuit was not a decision on the merits so as to allow *res judicata* ).

Applying these standards to the derivative and direct causes of action here, we hold that the Circuit Court's grant of summary judgment in the derivative action, based on a recommendation from the SLC, does not form a basis for *res judicata* on the direct action because it is *not a determination on the merits.* Like a court's refusal to appoint a receiver, a court's resolution of a derivative suit could either be on the merits, that is, if the complaint failed to state a claim, or merely because the SLC, considering a broad range of aspects, including some outside of the merits of the case, had reasonably concluded that dismissal was warranted. In this latter case, as we have described, the court's decision on whether to accept an SLC's recommendation *does not turn on the merits of the claim,* but rather on whether the SLC was independent, conducted a thorough investigation, and came to reasonable and principled conclusions. As the Sixth Circuit has recently detailed,

> [T]he focus of the [court's review of the SLC recommendation [50]] is not on the merits of the plaintiffs' claims, but on

---

**50.** In that case, the Court referred to this as the *Zapata* inquiry. This reasoning applied equally to our approach, which is even further removed from the merits of the claim than a *Zapata* inquiry.

whether maintenance of the suit would be in the company's best interest. This inquiry is one step removed from the actual merits and allows a special litigation committee to recommend dismissal, consistent with its business judgment, **even if a derivative suit may ultimately be successful.** (Emphasis added.)

*Booth Family Trust,* 640 F.3d at 139. Although, as the Circuit Court in this case observed, the SLC may address and resolve factual issues, *res judicata* requires a final *judicial* resolution of the merits of the case, not a final judgment rendered by private parties. Moreover, the SLC decision, itself, may turn on other considerations than the merits of the case, and, in an extreme case, the SLC may affect a dismissal even though the plaintiff's claims are meritorious. Thus, a trial court's resolution of a derivative complaint, when based on the recommendation of a Special Litigation Committee, cannot be said to be a final judicial resolution of the merits of the claims. Accordingly, the Circuit Court erred in dismissing Petitioners' direct action.

## V.

Finally, we reach the issue which began this litigation: whether the Stock Purchase Agreements entered into by the Boland children are enforceable. After the corporations sued to enforce the Agreement against Colleen Boland's estate, the estate, along with John and Kevin, resisted, arguing that the stock purchase agreements had been breached, that the contract had not endured past Mr. Boland's death, and that the Agreements were invalid and unenforceable contracts of adhesion. The Circuit Court disagreed, and held that the stock purchase agreement signed by Colleen Boland was valid and enforceable, granting summary judgment to the corporations.

When reviewing a trial court's grant of summary judgment, the appellate court must determine whether there is a dispute as to a material fact sufficient to require an issue to be tried. *See Frederick Rd. Ltd. P'ship v. Brown & Sturm,* 360 Md. 76, 93, 756 A.2d 963, 972 (2000) ("[A]n appellate

▬▬▬▬▬

court's review of the grant of summary judgment involves the determination whether a dispute of material fact exists."). "Summary judgment is not a substitute for trial.... Evidentiary matters, credibility issues, and material facts which are in dispute cannot properly be disposed of by summary judgment." *Id.*

> The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. In reviewing a grant of summary judgment under Md. Rule 2–501, we independently review the record to determine whether the parties properly generated a dispute of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.
>
> (Quotation marks and citations omitted.)

*Haas v. Lockheed Martin Corp.,* 396 Md. 469, 479, 914 A.2d 735, 741 (2007). "Merely proving the existence of a factual dispute is not necessarily fatal to a summary judgment motion." *Appiah v. Hall,* 416 Md. 533, 546, 7 A.3d 536, 544 (2010). A "dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

### A. Consideration

The first allegation we review under this standard is the Petitioners' claim that the stock purchase agreements were not supported by consideration. The Circuit Court held as follows:

> There is ample consideration for the agreements.... [Colleen] received the stock, with a guaranteed purchaser should she choose to redeem it, at a readily determinable price. Shareholder agreements like the SPAs are vital for the protection of those financially interested in family-held corporations. As has been explained in an Illinois case

construing a similar agreement: "While the shareholder of a public-issue corporation may readily sell his shares on the open market ... his counterpart of the close corporation often has ... no ready market for his shares should he desire to sell." *Galler v. Galler* [32 Ill.2d 16], 203 N.E.2d 577, 583–84 (1964).

* * *

In return for a readily-determinable redemption price, Colleen surrendered her right to freely alienate the stock, so that it would stay in the Boland "family."

██ We agree with the Circuit Court that a right to redeem stock can be valuable consideration for a shareholder. Other courts have so held. For example, in *Mayer Hoffman McCann, P.C. v. Barton,* 614 F.3d 893 (8th Cir.2010), the Eight Circuit Court of Appeals held that a buy-sell stock agreement provided sufficient consideration, i.e., a guaranteed buyer for stock which may have been difficult to alienate, in return for the shareholders' promise not to compete after ending their employment.[51] Similarly, in *Yeng Sue Chow v. Levi Strauss & Co.,* 49 Cal.App.3d 315, 122 Cal.Rptr. 816 (1975), the California Court of Appeals held that a stock repurchase agreement upon the death of the shareholder was

---

**51.** *Mayer Hoffman McCann* dealt with a professional corporation and, like the Circuit Court in this case, the *Mayer Hoffman McCann* court identified a lack of a secondary market for the stock:
"Only licensed professionals who are employed by the professional corporation may be shareholders or directors. In addition, shares can only be transferred to other individuals licensed to practice in the same profession." 1 A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 70.10 (perm. ed., rev. ed.2002). Thus, there is no ready market for the sale of shares of a professional corporation's stock. *See id.* Accordingly, "[i]f a buyback is not provided, a minority shareholder who resigns from or is forced out as an employee of a professional corporation is in a difficult position, absent a protective shareholders' agreement." 1 F. Hodge O'Neal, Robert B. Thompson, & Blake Thompson, O'Neal and Thompson's *Close Corporations and LLCs: Law and Practice* § 2.9 (Rev.3d ed.2004).
*Mayer Hoffman McCann, P.C. v. Barton,* 614 F.3d 893, 904 n. 20 (8th Cir.2010).

valid and enforceable, observing that the "guaranteed buyer" was a significant guarantee for the deceased's estate:

> It is a matter of common knowledge that in most instances there is no easily ascertainable market value for the shares of closely held corporations. As a consequence, the various formulae set for determining the option price (e.g., book or appraisal value, par value) provide the participant or his heir an *assured market at a fixed price* for the stock in the event of death, retirement or other termination of interest in the corporation.... If a repurchase plan were not in effect, the widow might find it impossible to sell her shares in the open market, and thus might be forced to sell to the surviving shareholders at an unreasonably low price, if they would purchase her stock at all. (Quotation marks omitted.)

*Id.* at 820. *See also* O'Neal and Thompson, 1 *Close Corporations and LLCs: Law and Practice* § 7:3 (Rev. 3rd Ed.2010) ("One of the most distinctive features of any closely held enterprise is the lack of a market for selling one's interest in the entity.... It is not surprising that many participants in closely held businesses are interested in ways to provide liquidity to themselves or their heirs upon their death, disability, retirement, or their leaving the business.").

John and Kevin do not dispute that the SPA's promise of redemption upon the death of a shareholder formed valid consideration for the contract. Instead, John and Kevin's consideration argument is based on an alternate theory of consideration, that is, an assurance that "during [Colleen's] lifetime, the companies would remain in the ownership and control of her parents, siblings, and select key employees, without the threat of new, unwanted, outside shareholders." [52] Even if this alternate theory of consideration fails, the con-

---

52. At least one court has rejected as insufficient a similar theory of consideration when, like here, not every shareholder was required to enter into similar restrictions on alienation. *See Sumners v. Serv. Vending Co.,* 102 S.W.3d 37, 42–43 (Mo.Ct.App.2003) (finding buy/sell agreement was unsupported by consideration because there was no *"mutual exchanges of first refusals by all shareholders* [because the father and majority shareholder] was not bound by any agreement").

tract would still be supported by the consideration identified by the circuit court. Because there is no factual dispute that the contract was supported by that consideration, in the form of a "ready buyer," we hold that the Circuit Court's finding that the SPAs were supported by consideration was proper.[53]

### B. Duration

The second issue raised by John and Kevin is the intended duration of the Stock Purchase Agreements. The brothers observe that the SPAs have no stated duration in the agreements, and argue that "the purpose of the agreements were to insure absolute control by Mr. Boland ... [and that there is no evidence] that the stock purchase agreements were intended to serve as succession documents."

The Circuit Court, however, disagreed that the intended duration of the SPAs was unclear:

[T]he SPAs were *not* silent as to their duration, as they unambiguously made express provision for two eventualities: 1) purchase of stock by the corporation during the shareholder's life; 2) purchase of stock by the corporation at the time of the shareholder's death. As to the first eventuality, if the stock was redeemed during the shareholder's life, no stock would remain to trigger the second eventuality, and the SPA would lapse.

If no stock was redeemed during the shareholder's life, death *would* trigger the second eventuality.... Thus, the implicit duration of the SPAs was the lifetime of Colleen, which turned out to be 25 years. The court finds that

---

53. On the consideration issue, John and Kevin raise multiple other claims, alleging that there was an improper gift of stock to Sean Boland, Jr., and that the SPAs were breached by oppression. To the extent that John and Kevin can prove these allegations, the may have a remedy in their derivative or direct actions. These arguments, however, are factually unrelated to the consideration issue. As we have said above, "A dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a material fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

period of time to be reasonable, given the nature of the agreement and that the Boland children were gifted the stock during their youth.

 As John and Kevin correctly observe, a contract may not exist in perpetuity in the absence of an express provision, and in such absence, "a reasonable duration will be implied by the court." *Lerner v. Lerner Corp.*, 132 Md.App. 32, 45, 750 A.2d 709, 716 (2000). Yet, even absent any explicit length of time, the contract's duration may be defined by contingent future events. *See Pumphrey v. Pelton*, 250 Md. 662, 665, 245 A.2d 301, 303 (1968) ("The fact that Clause 19 provides that it terminates upon the *expiration of the patents and copyrights* saves it from the rule that a contract may not exist in perpetuity in the absence of an express provision." (emphasis added)). As the Circuit Court observed, the duration of the SPAs until the death of the shareholder was *clearly an event anticipated by the SPAs*. A provision in a stock purchase agreement providing for repurchase upon the shareholder's death is clearly intended to endure until the shareholder's death. Thus, although a court may imply a reasonable duration in the absence of any signal of duration in the contract, this step is not required here.

## C. Invalidity of Contract Due to Alleged Improper Acts by Majority Shareholders

As we have alluded to above, the main thrust of John and Kevin's "contract" argument is that the alleged threats and oppressive acts of the majority shareholders have invalidated the contract. The Circuit Court rejected these claims as an inappropriate attempt to "bootstrap" their direct claims into a traditional contract analysis. We agree with the Circuit Court that, if the contract was supported by consideration and otherwise valid, it should be enforced against the estate.

 In reaching this holding, we are not completely unreceptive to the allegations by John and Kevin. Rather, we merely conclude that the brothers have raised them in the wrong venue. Pursuant to our above holding, John and Kevin

will have an opportunity to have their direct claims, alleging oppression and requesting dissolution, heard. In the "dissolution" action, they may raise their claims regarding improper threats to use the corporate repurchase right contained in the SPAs. A shareholder's action for dissolution invokes the equitable jurisdiction of the court, and gives the court an opportunity to fashion appropriate relief:

> [J]udicial dissolution of a corporation is viewed by courts as an extreme remedy. It has been said that a decree of dissolution will be entered only when no other adequate remedy is available. Many jurisdictions provide alternate remedies when a shareholder seeking dissolution of a corporation[.]
>
> \*　　\*　　\*
>
> Statutes in some jurisdictions provide a panoply of miscellaneous relief alternatives to dissolution, including canceling or altering any provision in the articles of incorporation or bylaws of the corporation, canceling, altering or enjoining any corporate act, directing or prohibiting any corporate act, the removal or appointment of a director or officer, requiring an accounting, ordering the payment of dividends, or awarding damages to the aggrieved party. These options may not be exclusive, and a court may be empowered to grant in its discretion other appropriate relief.

16A William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 8043 (2003 Rev. Vol.). Although Maryland's dissolution statute does not explicitly contain such an enumeration of equitable remedies, *see* CA Section 3–413, neither does it foreclose them. On this point, we agree with the Court of Special Appeals' conclusion in *Edenbaum*, 165 Md.App. at 260, 885 A.2d at 380, where the court stated:

> While Corps. & Ass'ns § 3–413 only mentions dissolution as a remedy for oppressive conduct, we join other courts today which have interpreted their similar statutory counterparts to allow alternative equitable remedies not specifically stated in the statute.

(Citations and quotation marks omitted.)

(citing *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 631–35, 507 P.2d 387, 395–96 (1973)). Thus, should John and Kevin convince the court on those claims, the court may fashion appropriate equitable relief, including the relief sought by them here. In particular, we believe that a court should carefully scrutinize any use of the "involuntary" buy-back provision, contained in Section 3 of the Stock Purchase Agreements.[54]

In conclusion, our holding that the contract was enforceable against Colleen's estate does not give the corporations cover to use the SPAs in any manner they see fit, or to violate the rights of the minority shareholders. We merely conclude, as the Circuit Court did, that the Stock Purchase Agreement's repurchase upon death provision, a common feature of family-owned corporations, was a valid and enforceable contract in these circumstances. We therefore affirm the Circuit Court's grant of summary judgment with regard to the enforceability of the Stock Purchase Agreements.

**IN THE DERIVATIVE ACTION, (CIRCUIT COURT CASE # 282138-V, APPELLATE NO. 123), JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND**

---

**54.** That section allows the corporations to repurchase stock at will, by providing "thirty (30) days written notice of the election to purchase." Courts have allowed corporate buyback provisions in closely-held corporations to be conditioned to a number of triggers, for example when the shareholder "dies, retires, is terminated, or desires to sell his shares." *See* O'Neal and Thompson, 1 *Close Corporations and LLCs: Law and Practice* § 7:3 (Rev. 3rd Ed.2004). Yet, in some circumstances, courts have refused to enforce certain "triggered buyback provisions," finding that they were violative of the director's fiduciary duties. *See* O'Neal & Thompson at § 7:12 ("Courts have applied fiduciary duty to limit buybacks in a variety of circumstances. * * * [An even] stronger case for use of fiduciary duty can be made when the trigger for a buyback is ... voluntary leaving [of] the plaintiff."). If fiduciary duties can limit certain triggered buybacks, there clearly are limits on when a corporation can enforce a non-triggered, involuntary buyback of corporate stock.

TO THE CIRCUIT COURT FOR FURTHER PROCEED-
INGS CONSISTENT WITH THIS OPINION.

IN THE DECLARATORY JUDGMENT ACTION, (CASE
# 273284–V, APPELLATE NO. 123), JUDGMENT OF THE
CIRCUIT COURT DISMISSING PETITIONERS' CROSS–
CLAIMS VACATED. REMANDED TO THAT COURT
FOR FURTHER PROCEEDINGS CONSISTENT WITH
THIS OPINION. JUDGMENT OTHERWISE AF-
FIRMED.

COSTS TO BE SPLIT EQUALLY AMONG THE PAR-
TIES.

BATTAGLIA, J., dissents.

BATTAGLIA, J., dissenting.

I respectfully dissent. What we and our colleagues have
been asked to do in this case is wade in on an intra-family
financial dispute in which siblings are vying for financial
hegemony in their two family owned and operated corpora-
tions. Two of the Boland brothers seek to have this Court
consider their siblings on the boards of directors "as a ser-
pent's egg"[1] because of the latters' approval of stock ex-
changes to each other in an alleged unseemly effort to take
control of their corporations at the expense of the rest of the
family. In the face of these accusations, the boards of di-
rectors of the corporations formed a committee, which includ-
ed non-sibling disinterested directors, unrelated to the Boland
corporations, to investigate the disgruntled brothers' claims
and whether legal action should be undertaken. The commit-
tee recommended that pursuit of the claims in court would not
be in the best interests of the corporations. The trial court,
adhering to the business judgment of the disinterested com-
mittee, applied the business judgment rule to their investiga-
tion and recommendation and dismissed the disgruntled broth-
ers' claims. That decision was affirmed in a thorough and
evidently correct opinion by the Court of Special Appeals,

---

1. William Shakespeare, Julius Caesar, act 2, sc. 1.

*Boland v. Boland,* 194 Md.App. 477, 5 A.3d 106 (2010). Although I could adopt that opinion as my own, I wade into the mix to urge restraint in the judicial meddling in this familial affair.

What the majority does in its opinion is introduce a new standard of judicial review for a refusal to pursue litigation in a shareholder derivative action when a disinterested special litigation committee has recommended against pursuit of litigation. I would instead give our historical deference, referred to as the business judgment rule, to decisions made as a result of the recommendation of a special litigation committee (SLC), which is comprised of members who are disinterested in the subject of their investigation and recommendation. Further, I disagree with the majority's insistence on investigating any personal aspects of the lives of the members of the SLC to determine their disinterest and would hold that the directors are independent for the purposes of demand refusal where they are not financially involved in any way with the challenged board decision.

To put the whole case in context:

The boards of directors of the corporations, Boland Trane Services, Inc. and Boland Trane Associates, Inc., are comprised of five members, including three Boland siblings, Sean, James, and Louis, Jr., and two long-term employees of the corporations, Lawrence Cain and John Heise. In 2005, the boards of directors voted to sell stock to James, Louis, Jr., Mr. Cain, and Sean, Jr., Sean's son. Mr. Heise was not present at this meeting. Each director abstained from the vote on their purchase, and Sean did not vote on his son's purchase. After siblings John and Kevin, Petitioners, learned of these stock purchases, they challenged them in two separate actions before the Circuit Court for Montgomery County, both filed on May 1, 2007.

In the first action, John and Kevin filed a cross-claim and counterclaim in an ongoing dispute between the corporations and the estate of their sister, Colleen Boland. In this dispute, the corporations sought to enforce, by declaratory judgment, a

shareholder purchase agreement that Colleen had signed prior to her death in which she had agreed to resell her stock to the corporations. John and Kevin, as shareholders, alleged that the directors' approval of the stock purchases by the directors and Sean, Jr. constituted oppression, fraud, illegality, breaches of the fiduciary duties of loyalty and good faith, and self-dealing.

In another action, John and Kevin themselves filed a derivative complaint as shareholders, purportedly on behalf of the corporations, against Sean, James, Louis, Jr. and Mr. Cain, the four directors who voted in approval of the stock purchases. Similar to the direct claims in the first action, the derivative complaint alleged that the directors engaged in oppression, fraud, illegality, breaches of the fiduciary duties of good faith and loyalty and self-dealing when they approved the stock purchases. The two actions were consolidated by the circuit court.

Thereafter, the boards of directors, in response to John and Kevin's previously-made demand,[2] formed a special litigation committee,[3] to evaluate whether the corporations' pursuit of

---

**2.** In a derivative action, shareholders pursue corporate rights, including challenging the actions of a board member as a breach of a fiduciary duty owed to the corporation, that the corporation itself did not assert on its own. *Werbowsky v. Collomb*, 362 Md. 581, 599, 766 A.2d 123, 133 (2001). As this is an extraordinary check on the power of the board of directors to manage and make decisions on behalf of the corporation, the shareholder generally must "first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed," or demonstrate that such a demand would be futile, before pursuing a derivative action. *Id.* at 600, 766 A.2d at 133. The pre-suit demand is reviewed by the board of directors, who may accede to the demand and permit the shareholder derivative action or refuse demand to pursue it. Following a demand refusal, the shareholder may proceed in a "demand refused" action. *Shenker v. Laureate Education, Inc.*, 411 Md. 317, 983 A.2d 408 (2009). The corporation may seek to have the derivative action dismissed, as not within the best interests of the corporation, and the shareholder may challenge that the demand was wrongfully denied.

**3.** A matter of "common practice," a special litigation committee of independent directors ("SLC") is formed to review a shareholder's demand and then recommend to the board of directors whether pursuit

John and Kevin's allegations was in the best interests of the corporation. On July 30, 2007, the circuit court stayed the consolidated case, including the declaratory judgment action involving John and Kevin's direct claims against the corporations and directors, to await a determination by the SLC.

The SLC was comprised of James J. Cromwell, Esq., and Charles J. Wolf, II, CPA, two individuals who had no interest in the disputed transactions. The SLC also engaged independent counsel, Albert D. Brault, Esq., who similarly had no interest in the transactions under scrutiny.

After a five-month investigation, the SLC determined that the pursuit of John and Kevin's claims was not in the best interests of the corporation, and thus recommended termination of the derivative actions, a decision commonly known as "demand refusal." Thereafter, on May 23, 2008, the defendant directors moved to dismiss, or in the alternative, for summary judgment in the derivative action. The circuit court granted summary judgment in favor of the defendant directors in the derivative action, applying the business judgment rule and deferring to the business judgment of the corporations upon finding that the SLC conducted its investigation and reached its recommendation independently, reasonably and in good faith. Following the grant of summary judgment, the corporations and defendant-directors also moved for dismissal, or in the alternative summary judgment, as to John and Kevin's claims against the corporation and directors in the direct action, asserting that the doctrine of *res judicata* prevented John and Kevin from re-litigating claims that were already resolved by the circuit court in the derivative action. The circuit court agreed and dismissed John and Kevin's claims.

We have historically deferred to the board of directors's business judgment, presuming that their actions are in the best interest of their corporation unless otherwise demonstrat-

---

of the shareholder derivative action is in the best interests of the corporation. *See Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (2001).

ed. In his treatise, *Maryland Corporation Law*, James J. Hanks, Jr. explains that the business judgment rule

> "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Thus the board's "decisions will not be disturbed if they can be attributed to any rational business purpose. A court . . . will not substitute its own notions of what is or is not sound business judgment."

Section 6.8, at 189 (2007 Supp.), quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del.2000), and *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971). Under this standard, Maryland courts review internal disputes of shareholders challenging the decisions of the board of directors by asking "whether any rational business person could have reached that result, proceeding independently and in good faith with the best interests of the corporation in mind." *Bender v. Schwartz*, 172 Md.App. 648, 667, 917 A.2d 142, 152 (2007), citing *Aronson*, 473 A.2d at 812.

For more than a hundred and fifty years, we have employed a presumption of validity upon the decisions of the board of directors made on behalf of the corporation and later challenged by shareholders. In the mid–19th century, we held in *Anacosta Tribe v. Murbach*, 13 Md. 91, 94–95 (1859), that the corporation's own regulations, rather than the equitable powers of the court, were to generally govern disputes between shareholders themselves or with directors. In 1864, we observed in *Mayor and City Council of Baltimore v. Baltimore & Ohio Rail Road Company*, 21 Md. 50, 92 (1864), that "the decision of questions of expediency, as to the fitness of the means employed, are properly confided by the law to the Board of Directors. Courts of Justice will not pass upon them—they are manifestly incompetent to the task—and to attempt to do so, would often defeat the ends of the law."

In 1894, in *Shaw v. Davis*, 78 Md. 308, 316–17, 28 A. 619, 621, we reiterated our refusal to review "internal disputes between shareholders" or shareholders and directors, "unless there be something illegal, oppressive, or fraudulent." In *Shaw*, a minority shareholder sought to enjoin his company from entering in a lease. We refused the intervention and opined that we should "leave all such matters to be disposed of by the majority of stockholders in such a manner as their interests may dictate," 78 Md. at 316, 28 A. at 621, rather than to the will of a minority shareholder with the assistance of the courts, absent a showing of fraud, illegality or conduct showing ultra vires, to avoid contravening the ideals of free government:

> And if the proposed lease be not *ultra vires* or unlawful or fraudulent, no court, at the instance of a minority stockholder, or at the instance of anyone else, has the power or the right to restrain the majority from dealing with the property as they may deem most advantageous to their own interests. Any other doctrine would put it in the power of a single stockholder, owning but one share out of many hundreds, to transfer the entire management of a corporation to a court of equity and would effectually destroy the right of the owners of the property lawfully to control it themselves. It would make a court of equity practically the guardian, so to speak, of such a corporation, and would substitute the chancellor's belief as to what contracts a corporation ought, as a matter of expediency, or policy, or business venture to make, instead of allowing such questions to be settled by the persons beneficially interested in the property. No such arbitrary or dangerous power has ever been claimed by any court, and, if laid claim to, it would never be tolerated in a free government.

*Id.* at 328–29, 28 A. at 625. We also concluded that the corporation, rather than the minority shareholder, was adversely affected by the disputed lease, and thus "every litigation must be in the name of the company, *if the company really desire it.*" *Id.* at 317, 28 A. at 621 (emphasis added).

Although the business judgment rule may be an exercise in restraint, it is not a "rubber stamp." At the turn of the twentieth century, in *Du Puy v. Transportation & Terminal Company*, 82 Md. 408, 33 A. 889 (1896), we found the fraud necessary under the business judgment rule to intervene when two minority shareholders claimed that the corporation's majority shareholder, board of directors, and appointed trustee had engaged in a series of fraudulent acts to wind up the solvent corporation. Shortly after the minority shareholders, the Du Puys, had purchased shares, the president of the board of directors and the majority shareholder took the Du Puys' money for themselves and wound up the corporation by appointing a trustee who agreed to distribute the corporation's assets to members of the board and associates of the majority shareholder. In intervening, we recognized the risk of inefficiency and continued fraudulent and wrongful conduct were we not to act and maintained that a receiver appointed by the circuit court, rather than the court itself, would review the corporation's actions:

> It is not for us to say what particular assets or property a receiver can, when appointed, recover. It is enough for the purposes of this case for us to be able to see from the record that wrong and fraud have been perpetrated, and that wrong and that this is an eminently fit case for the appointment of a receiver to unmask and rip open whatever is not beyond the reach of a successful assault.

*Id.* at 442, 33 A. at 895.

In 1907, in *Sloan v. Clarkson*, 105 Md. 171, 66 A. 18, we applied the business judgment rule to review a demand refusal in a shareholder derivative action. In that case, the corporation refused the demand of a minority shareholder and director, Frank S. Clarkson, to require majority director, majority shareholder, and corporate officer, E. Eugene Sloan, to produce accounting records of his work for the corporation. As the managing agent of the corporation, Sloan was entrusted with overseeing its entire business, collecting its profits and taking a commission for himself before handing over the

remainder to the corporation. Clarkson's bill alleged, and neither Sloan nor the corporation in their demurrer denied, that the refusal of his demand by the majority of directors was the result of fraudulent and improper motives. The circuit court overruled the demurrer and we affirmed, holding that the corporation and Sloan must provide an answer because the business judgment rule enunciated in *Shaw* and *Du Puy* did not insulate the corporation where, if proven, the demand was refused with a fraudulent or improper motive.

Thus, our business judgment rule is premised on the belief that the will of the majority, and the decisions of experienced business professionals on the board of directors, should be afforded a presumption of validity, unless a *minority shareholder shows* that such acts are fraudulent, illegal, conduct of ultra vires, or grossly negligent. *McQuillen v. National Cash Register Co.*, 112 F.2d 877, 883 (4th Cir.1940) (applying Maryland law); *see also Williams v. Salisbury Ice Co.*, 176 Md. 13, 23, 3 A.2d 507, 512 (1939) ("There must be proof of fraud, and the onus of that proof is upon the complainant.").

When the Maryland General Assembly enacted the Director's Standard of Care provision, Section 2–405.1(a) of the Corporations & Associations Article, Maryland Code, in 1976, it embodied the business judgment rule. Section 2–405.1(a) requires a director to act "(1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." Maryland Code, (1975, 2007 Repl.Vol.), Section 2–405.1(a) of the Corporations & Associations Article. At the time the Section 2–405.1(a) was enacted, it was "well established that courts generally will not interfere with the internal management of a corporation." *Devereux v. Berger*, 264 Md. 20, 31–32, 284 A.2d 605, 612 (1971). In 1999, the General Assembly expressly enacted the business judgment presumption by adopting Section 2–405.1(e), which states that "[a]n act of a director of a corporation is presumed to satisfy the

standards of subsection (a) of this section." [4]

In 2001, in *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123, we reviewed the application of the business judgment rule in shareholder derivative actions. We declined to fully adopt the approach in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), which held that a shareholder's pre-suit demand on the corporation may be excused where there is a reasonable doubt as to whether the directors were independent and whether the challenged transaction was the product of proper business judgment. In so doing, we reasoned that the value in the demand requirement is tied to business judgment rule protection enjoyed by directors against inappropriate challenges of minority shareholders:

> The demand requirement *is* important. Directors are presumed to act properly and in the best interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing. Nor should they, or the corporation, be put unnecessarily at risk by minority shareholders bent simply on mischief, who file derivative actions not to correct abuse as much to coerce nuisance settlements.

*Id.* at 618–19, 766 A.2d at 144. We concluded that, "If demand is made and refused, that decision, and the basis for it, can be reviewed by a court under the business judgment rule standard." *Id.* at 619, 766 A.2d at 144.

The robustness of the business judgment rule is now being questioned by the majority's adoption in shareholder deriva-

---

4. Senate Bill 169 included section (e)'s presumption its Bill Analysis reiterated the connection between the business judgment rule and the director's statutory duty of care:

> Under current law, the standard of conduct for a corporate director in Maryland is the "business judgment rule", which creates a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company. *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir.1986). Senate Judicial Proceedings Committee Bill Analysis for Senate Bill 169, at 4 (1999).

tive actions of what it calls a middle ground in the application of the business judgment rule to acts of an SLC. *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), and *Zapata Corporation v. Maldonado,* 430 A.2d 779 (Del.1981), are the two leading approaches nationally to judicial review of demand refusals. The *Auerbach* standard adheres to the New York business judgment rule and limits judicial review to the disinterested independence of the SLC members and the reasonableness of the investigation's procedures and conclusions. *See* 3 93 N.E.2d at 1001–02. Delaware's *Zapata* standard utilizes a two-prong approach, placing the burden on the corporation to demonstrate the SLC's independence, good faith and the reasonableness of its investigation and conclusion and when met, then permits the court to use its own "independent business judgment" to determine whether the SLC decision was in the best interests of the corporation. *See* 430 A.2d at 788–89.

The majority's adoption of "enhanced *Auerbach,*" also known as the first prong of the *Zapata* standard, removes the presumption of our traditional business judgment rule in favor of the corporation. This ruling is contrary to our jurisprudence and the goal of acknowledging the will of the majority, absent a showing of director abuse by the plaintiff shareholder; our standard, like New York's *Auerbach* standard, has placed the burden on the plaintiff shareholder to demonstrate that the director action, including a demand refusal, was made unreasonably, in bad faith, or while the director was on both sides of the transaction and thus interested.

In the case *sub judice,* the circuit court reviewed the SLC's report under the deferential business judgment rule as recognized by the Court of Special Appeals as one to defer "to the decision of the board or committee not to pursue litigation unless the stockholders can show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." *Boland,* 194 Md.App. at 499, 5 A.3d at 119, quoting *Bender,* 172 Md.App. at 666, 917 A.2d at 152. The SLC members and counsel were disinterest-

ed and independent, the circuit court found, because each individual had never "been employed by, done business with or provided services for either corporation." The trial judge also found that the SLC's investigation and conclusions were made in good faith and reasonably in light of their "comprehensive investigation lasting approximately 5 months," including interviews with John and Kevin as well as 9 other individuals, a 30 page report and 32 exhibits. The circuit court held, and the Court of Special Appeals agreed in its reported opinion, that John and Kevin as derivative plaintiffs failed to rebut the presumption that the SLC, as the disinterested directors for the corporations, acted in the best interests of the companies. Just as did our colleagues on the Court of Special Appeals, I would affirm the reasoned application by the circuit court of the business judgment rule.

In addition to removing the presumption of business judgment rule, however, the majority also further requires the judiciary to enter the bowels of the corporation to determine the SLC independence. The majority defines the standard of independent business judgment to require an individual on the SLC to have no consequential formal, informal, professional or personal ties with the directors who are parties to the case, to the extent that the circuit court is required to conduct a background check on the SLC members and its independent counsel and require the SLC and the board of directors to disclose to the court their social, personal and other business affiliations. This standard is unworkable and intrusive.

We review the independence of SLC members, specifically their care, attention and sense of individual responsibility, to ensure that each member is "in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences." *Kaplan v. Wyatt*, 499 A.2d 1184, 1189, quoting *Aronson*, 473 A.2d at 816. The SLC members, James J. Cromwell, Esq., and Charles J. Wolf, II, CPA, and their independent counsel, Albert D. Brault, Esq., each asserted their disinterest and independence from the Board Defendants in the SLC report. There was no proof

of any financial interest or involvement in the stock purchases at issue.

In affirming the circuit court's finding of SLC independence, the Court of Special Appeals observed that "[t]here never has been a serious assertion by the appellants of lack of independence or good faith on the part of Cromwell or Wolfe or their counsel, Brault." 194 Md.App. at 512, 5 A.3d at 127. As the opinion stated, the SLC members could not be disqualified merely because the corporations and their directors were based on the fact that SLC members were appointed by the board of directors, as interested directors may appoint the SLC under Maryland law. *Id.* at 512 n. 16, 5 A.3d at 127 n. 16, quoting *Rosengarten v. Buckley*, 613 F.Supp. 1493, 1499 (D.Md.1985).

The majority, though, asserts that the circuit court's review of professional ties of the corporations and the SLC members was inadequate. Rather, the majority opines that the corporation must demonstrate that the SLC members experienced no influence from the interested directors, emanating from any professional, recreational, social, religious, or non-profit organization affiliations. Six degrees of separation, however, could potentially remove the "influence" from participating on an SLC.

The majority's independence inquiry beckons the question: how far must the circuit court go in order to establish the independence of the SLC members? For that matter, as the corporation now must bear the burden of proving the SLC's independence under the majority's standard, how much must the SLC members and Board Defendants disclose to show the SLC's ability to make an independent decision? Will the circuit court review the per stirpal lineage of each SLC member and explore whether an SLC member is within six degrees of separation from the members of the board of directors? Where a minority shareholder was once required to prove fraud, illegality or ultra vires on the part of the board of directors to proceed beyond a demand refusal, *Sloan v. Clarkson*, 105 Md. 171, 66 A. 18 (1907), the majority now

encourages the shareholder to pursue a derivative action, upon a simple showing that the SLC members and interested directors are members of collegial groups, such as, for example, the Maryland State Bar Association.

The independence of the SLC members and their counsel only should turn on whether they are financially interested in the board of directors's action or decision at issue. Rather than a review of the multifarious personal and professional relationships that will become unworkable and unnecessarily intrusive, a review of the members' financial relationship with the challenged transaction serves as a bright-line per capita approach to director independence. In this case, the Circuit Court for Montgomery County and the Court of Special Appeals properly concluded that, having no prior employment, business and thus financial connection to the boards' approval of stock purchases, Mr. Cromwell, Mr. Wolfe and Mr. Brault were all sufficiently disinterested to reach a decision regarding John and Kevin's demand without the inappropriate influence of the defendant directors. As to the derivative action, the circuit court properly applied the business judgment rule to the SLC report and granted summary judgment in favor of the corporations and the defendant directors.

The circuit court also correctly applied the doctrine of *res judicata* to John and Kevin's counterclaim and cross-claim that alleged the same facts as those underlying the derivative action. "Res judicata literally means 'a thing adjudicated,' and generally indicates '[a]n affirmative defense barring the same parties from litigating a second lawsuit on the same claim....'" *Lizzi v. Washington Metropolitan Area Transit Authority,* 384 Md. 199, 206, 862 A.2d 1017, 1022 (2004), quoting Black's Law Dictionary 1336–37 (8th ed.2004). "The doctrine embodies three elements: (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litiga-

tion." *R & D 2001, LLC v. Rice,* 402 Md. 648, 663, 938 A.2d 839, 848 (2008).

In this case, there is no dispute that the parties are identical or that the factual basis for John and Kevin's direct action do not diverge from that of the derivative action. Rather, the majority maintains that the circuit court's grant of summary judgment did not reach the merits of the derivative claim, but only the independence, good faith and reasonableness of the SLC and its investigation. I disagree.

A case need not reach trial before a court's resolution serves as a final judgment on the merits for *res judicata* purposes. *See deLeon v. Slear,* 328 Md. 569, 616 A.2d 380 (1992); *Adkins v. Allstate Insurance Co.,* 729 F.2d 974, 976 n. 3 (4th Cir.1984) ("For purposes of *res judicata,* summary judgment has always been considered a final disposition on the merits."). In *de-Leon v. Slear,* 328 Md. 569, 616 A.2d 380 (1992), we observed that "summary judgment for the defendant is a valid and final judgment" and that the doctrine of *res judicata* barred subsequent identical claims between the same parties or parties sharing privity with those of the earlier litigation. 328 Md. at 580, 616 A.2d at 385, citing Section 19, Comment g, of the Restatement (Second) of Judgments (1980).

In the case *sub judice,* the circuit court's prior grant of summary judgment against John and Kevin's derivative claims, which mirror the claims raised directly,[5] serve as a final judgment on the merits for purposes of *res judicata.*

I respectfully dissent.

---

5. The majority characterizes John and Kevin's oppression claim as a direct claim, citing *Edenbaum v. Schwarcz–Osztreicherne,* 165 Md.App. 233, 885 A.2d 365 (2005). We reviewed the application of the business judgment rule to direct claims in *Shenker v. Laureate Education, Inc.,* 411 Md. 317, 983 A.2d 408 (2009), and determined that the business judgment rule did not apply to direct claims, but *Shenker* addressed only whether the board of directors owes the common law fiduciary duties of candor and maximization of shareholder value to shareholders directly in the context of a cash-out merger transaction following the board's decision to sell the corporation.